AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

```
LODGED
CLERK, U.S. DISTRICT COURT

10/27/2020

CENTRAL DISTRICT OF CALIFORNIA
BY:        eva          DEPUTY
```

# UNITED STATES DISTRICT COURT

for the

UNDER SEAL        Central District of California

```
FILED

Oct 27, 2020

CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY      Nancy Brehme
Deputy Clerk, U.S. District Court
```

United States of America

v.

RAYMOND MAGANA and STEVEN R.
GOLDSTEIN,

        Defendant(s)

Case No.    2:20-mj-05181-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about April 2020 to in or about June 2020, in the county of Los Angeles in the Central District of

California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1001, 1040, 1343, 1344, 1349, and 1957; 15 U.S.C. § 545 | Respectively, making false statements to the government, fraud in connection with major disaster or emergency benefits, wire fraud, bank fraud, attempt and conspiracy to commit wire and/or bank fraud, money laundering, and false statement to the Small Business Association |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Sahil Idnani, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    October 27, 2020          **DOUGLAS F. McCORMICK**
                                        *Judge's signature*

City and state:  Santa Ana, California      Hon. Douglas F. McCormick, U.S. Magistrate Judge
                                               *Printed name and title*

AUSA: Charles Pell (714-338-3542)

**A F F I D A V I T**

I, Sahil Idnani, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an support of a criminal complaint against, and arrest warrants for: (a) Raymond MAGANA (year of birth: 1980) and (b) Steven R. GOLDSTEIN (year of birth: 1984), for violations of Title 18, United States Code, Sections 1001, 1040, 1343, 1344, 1349, and 1957, and Title 15, United States Code, Section 545, which criminalize, respectively, making false statements to the government, fraud in connection with major disaster or emergency benefits, wire fraud, bank fraud, attempt and conspiracy to commit wire and/or bank fraud, money laundering, and false statement to the Small Business Association (collectively, the "Subject Offenses").

2.   This affidavit is also made in support of an application for warrants to search for evidence described in Attachment B, which are the fruits, instrumentalities, and evidence of violations of the Subject Offenses.

3.   The two locations to be searched are:

a.   SUBJECT PREMISES#1: A single-story house located at 17936 Stillmore Street, Santa Clarita, California 91387, where MAGANA resides, as described in more detail in Attachment A-1.

b.   SUBJECT PREMISES#2: A single-story house located at 18624 Calahan Street, Northridge, California 91324, where GOLDSTEIN resides, as described in more detail in Attachment A-2.

4.   The facts set forth in this affidavit are based upon my personal observations, my direct participation in this investigation, discussions with other law enforcement personnel involved in this

investigation (including from the U.S. Small Business Association-Office of the Inspector General), my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   SUMMARY OF PROBABLE CAUSE

5.     IRS-CI and SBA-OIG have been investigating a fraudulent scheme in which perpetrators fraudulently applied for Paycheck Protection Program (PPP) loans under The Coronavirus Aid, Relief, and Economic Security (CARES) Act, which was passed earlier this year to assist businesses adversely affected by the COVID-19 pandemic to retain workers and cover payroll or other specific expenses.

6.     As set forth in greater detail below, IRS-CI and SBA-OIG uncovered that MAGANA and GOLDSTEIN applied for more than five separate PPP business loans totaling more than $2,500,000 from various banks, of which more than $1,950,000 was issued.

7.     Bank records show that shortly after the business accounts received those PPP funds, MAGANA and GOLDSTEIN then transferred hundreds of thousands of dollars into their personal bank accounts.

8.     Further investigation revealed that to qualify for those PPP loans, MAGANA and GOLDSTEIN provided false information and attached fabricated IRS documents with the loan applications, including falsely claiming on one application that employee payroll

2

expenses were more than $4,500,000 per year, when in reality, they did not have such expenses.

### III. BACKGROUND OF SPECIAL AGENT SAHIL IDNANI

9.  I am a Special Agent with the Internal Revenue Service Criminal Investigation (IRS-CI) and have served in this capacity since July 2009.  As part of my training as a Special Agent, I attended the Federal Law Enforcement Training Center in Glynco, Georgia, for approximately six and one-half months.  I received training in criminal and financial investigative techniques with an emphasis in accounting and criminal tax law.  Prior to becoming a Special Agent, I was a financial analyst at Credit Suisse.  This experience involved analyzing and performing evaluations on various investments.  My education includes a finance and accounting degree from Stern School of Business at New York University.

10.  I personally have conducted and assisted in investigations of criminal violations of the Internal Revenue Laws, the Bank Secrecy Act, and the Money Laundering Control Act.  Many of these investigations focused on individuals deriving income from both legal and illegal sources and preparing false federal income tax returns. These investigations have involved the use of electronic and physical surveillance; the use of informants and cooperating witnesses; undercover operations; and the preparation and execution of search and arrest warrants.  I have interviewed witnesses, subjects and targets of investigations, and cooperating defendants.  I have also consulted with other experienced senior investigators concerning the methods and practices of individuals involved in the preparation of false income tax returns, income tax evasion, and money laundering.

#### IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

Based upon my review of investigative reports and notes, bank records, witness statements, my discussions with other law enforcement officers working on this investigation, including Special Agent Jasmin Gonzalez from the SBA-OIG, and other evidence, I learned the following:

**A.   <u>The Paycheck Protection Program</u>**

11.   The CARES Act is a federal law enacted in around March 2020 and was designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP.  Around April 2020, Congress authorized over $300 billion in additional PPP funding.

12.   In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  One such certification requires the applicant (through its authorized representative) to affirm that "[t]he [PPP loan] funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the small business (through its authorized representative) must state, among other things, its:

4

(a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

13.   On or about August 20, 2020, I spoke with representatives from Customers Bank.  They informed that a business PPP loan application is received and processed, in the first instance, by a participating financial institution, then transmitted, for further review, to the SBA to assess the applicant's eligibility. If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own funds.

14.   Furthermore, I have also learned that PPP loan proceeds must be used by the business on certain permissible expenses -- payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses at least 75% of the PPP loan proceeds on payroll expenses.

B.   **Entities used by MAGANA and GOLDSTEIN**

15.   As discussed below, MAGANA and GOLDSTEIN used the following entities to apply for millions of dollars in PPP loans: (1) The Building Circle, LLC; (2) Antelope Valley Residential Development, LLC; (3) Forward Builders, LLC; and (4) Beagle Real Estate

Investments, LLC.  I researched public documents, including from the California Secretary of State, from which I learned the following:

16.  The Building Circle, LLC was formed on December 4, 2017. Raymond Magana is listed as the CEO.  G.P. and J.P. are listed as listed as additional members of the entity.

17.  Forward Builders, LLC was formed on February 2, 2016. MAGANA is listed as the CEO.  There are no additional members.

18.  Beagle Real Estate Investments, LLC was formed on August 26, 2015.  GOLDSTEIN is listed as the only member.

19.  Antelope Valley Residential Development, LLC was formed on December 5, 2016.  MAGANA is listed as a Chief Executive Officer, and GOLDSTEIN is listed as a Manager.

**C.** **IRS and California EDD records for the entities used by MAGANA and GOLDSTEIN in their PPP loan applications confirm that they do not report having any employees, much less the ability to pay millions of dollars in purported employee salaries.**

20.  I obtained IRS tax records for entities Antelope Valley Residential Development, LLC, The Building Circle, LLC, Forward Builders, LLC, and Beagle Real Estate Investments, LLC, which I reviewed and from which I learned the following:

21.  For 2017 and 2018, Antelope Valley Residential Development, LLC filed Form 1065 tax returns (U.S. Return of Partnership Income) with the IRS.

a.  No employees were listed on those forms.  MAGANA and GOLDSTEIN were listed as 50% partners on those forms.

b.  Antelope Valley's 2017 Form 1065 listed gross receipts/sales of $0, a short term capital gain of $244,247, and ordinary business loss (line 22) of -$26,935, with income loss of

- $13,467 and net short term capital gain of $122,123 flowing to each MAGANA and GOLDSTIEN on Forms K-1.

     c.  Antelope Valley's 2018 Form 1065 listed gross receipts/sales of $91,985, a short term capital gains of $0, and ordinary business income (line 22) of $71,114, with income of $49,779 flowing to each MAGANA and GOLDSTIEN on Forms K-1.

22.  For 2018, The Building Circle LLC filed a Form 1065 tax return with the IRS.

     a.  No employees were listed on that form.  MAGANA was listed as a 50% partner, and J.P. and G.P. were each listed as 25% partners on that form.

     b.  The Building Circle LLC's 2018 Form 1065 listed gross receipts/sales of $7,519 and ordinary business loss (line 22) of - $4,673, with income loss of - $1,168 flowing to each of J.P. and G.P., and -$2,337 to MAGANA on Forms K-1.

23.  On or about October 15, 2018, MAGANA filed a 2017 Form 1040 (U.S. Individual Income Tax Return) for himself.

     a.  In the box next to the signature box, entitled "Your occupation," MAGANA listed "REAL ESTATE INVESTOR."

     b.  Line 37 listed adjusted gross income of $108,184, which was comprised of $122,123 in capital gain (line 13) and - $13,939 loss in rental real estate/partnerships/Schedule E (line 17).

     c.  Schedule E lists 2 properties being rented, for a net loss of -$13,949.

     d.  No employee costs are listed on any of the schedules.

     e.  On or about March 9, 2019, MAGANA filed a 2018 Form 1040 for himself.

     f.  In the box next to the signature entitled "Your

occupation," MAGANA listed "REAL ESTATE INVESTOR."

g. Line 7 listed adjusted gross income of $164,272, which was comprised of $87,702 in IRA/pension income (line 4b) and $77,750 in Schedule 1 income (line 6)

h. The Schedule 1 income of $77,750 resulted from $21,124 in Schedule C business income (line 12), $102,309 capital gain income (line 13), and $-45,863 loss in Schedule E rental real estate/partnerships/etc (line 17).

i. The Schedule C listed principal business as 'REAL ESTATE" with business name "FORWARD BUILDERS LLC." The Schedule reported $267,500 in gross receipts or sales (line 1), with a gross income of $51,661 (line 7) that was further reduced by reported total expenses of $30,557 (line 28), which resulted in a net profit of $21,124 (line 31).

j. Schedule E listed four properties.

k. No employee costs are listed on any of the schedules.

24. On or about February 20, 2019, GOLDSTEIN filed a 2018 Form 1040 for himself and his wife.

a. In the box next to the signature entitled "Your occupation," GOLDSTEIN listed "real estate," and his wife listed "Teacher," with her receiving a W-2 from the Los Angeles Unified School District.

b. Line 7 listed adjusted gross income of - $88,390, which was comprised of $63,007 in wages (line 1) and - 150,966 loss from Schedule 1 (line 6).

c. The Schedule 1 loss of -$150,966 resulted from -$171,758 in business income/loss (line 12), -$3,000 in capital gain (line 13), $21,232 in rental real estate/partnerships/etc (line 17),

and $2,560 in other income (line 21).

      d.   The Schedule C listed principal business as 'Real Estate" with no business name listed.  Schedule C's loss of − $171,758 resulted from $547,000 in gross receipts (line 1) minus cost of goods sold for a gross income/loss of $109,231 (line 7) minus total expenses of $62,527 (line 28).

      e.   Schedule E lists one property being rented, for a net loss of −$103.

      f.   No employee costs are listed on any of the schedules.

25.  On or about March 19, 2020, GOLDSTEIN filed a 2019 Form 1040 for himself and his wife.

      a.   In the box next to the signature entitled "Your occupation," GOLDSTEIN listed "real estate," and his wife listed "Teacher," with her receiving a W-2 from Los Angeles Unified School District.

      b.   Line 8b listed adjusted gross income of $22,910, which was comprised of $65,515 in wages (line 1), −$3,000 in capital gains/loss (line 6), and −$37,405 in other income from Schedule 1 (line 7a).

      c.   Form 8995 (Qualified Business Income Deduction Simplified Computation) lists 3 businesses: (a) Beagle Real Estate Investments with income of $23,857; (b) Single Family Residence for loss of −$3,476; and (c) Antelope Valley Residential Develop with income of $23,870.

      d.   Schedule 1 lists $25,671 in business income from Schedule C (line 3), $20,394 in income from rental real estate/partnerships/etc (line 5) and −$83,470 in other income (line 8), for a combined amount of $37,405 (line 9)

e.   The Schedule C listed principal business as 'Real Estate" with business "Beagle Real Estate Investments LLC."  Schedule C listed gross receipts/sales of $1,229,507 (line 1), cost of goods of $1,137,078 (line 4), which resulted in gross income of $92,429 (line 7).  Line 28 then listed total expenses of $66,758, so the difference was net profit of $25,671.

i.   For the expenses, nothing was listed for contract labor (line 11), employee benefit programs (line 14) or wages (line 26).

f.   Schedule E lists one property being rented, for a net loss of -$3,476.

g.   No employee costs are listed on any of the schedules.

26.  IRS records did not report any Forms W-2 or 1099 issued by those entities for any employees.

27.  On September 1, 2020, I spoke with representatives from California Employment Development Department and obtained confirmation that none of the individuals and businesses entities Antelope Valley Residential Development, LLC, The Building Circle, LLC, Forward Builders, LLC, and Beagle Real Estate Investments, LLC, has registered as a business with the EDD.  EDD explained that if a business is not registered with EDD, that business has no record of having and/or paying employees in the State of California.

28.  The information received from IRS and EDD is summarized in this chart:

| EIN LISTED ON PPP APPLICATION | BUSINESS ENTITY | NO. OF EMPLOYEES CLAIMED IN PPP LOAN APPLICATIONS TO BANKS IN 2020 | TOTAL EMPLOYEE WAGES CLAIMED IN PPP LOAN APPLICATIONS IN 2020 | IRS RECORDS | EDD |
|---|---|---|---|---|---|
| 82-3584552 | Building Circle | 40 | $4,500,000 | No Form 940 or Form 941 found | No records found |
| 81-1406193 | Forward Builders LLC. | 13 | $1,730,000 | No Form 940 or Form 941 found | No records found |
| 47-5222577 | Beagle Real Estate | 13 | $1,704,000 | No Form 940 or Form 941 found | No records found |
| 81-4674669 | Antelope Valley Residential Dev LLC. | 11 | $1,534,870 | No Form 940 or Form 941 found | No records found |

**D.   05/14/2020: MAGANA submitted false information and fabricated tax documents to U.S. Bank in a PPP loan application for more than $900,000 in the name of The Building Circle, LLC, which the bank denied.**

29.   On or about May 14, 2020, MAGANA submitted an application to U.S. Bank for a PPP loan in the amount of $937,000, on behalf of The Building Circle LLC, which is one of the shell entities registered to MAGANA.

30.   The application listed MAGANA as the principal with a home address of SUBJECT PREMISES#1.  The loan application listed the address for The Building Circle LLC as SUBJECT PREMISES#1.

a.   MAGANA submitted his phone number on the application forms as (323) xxx-0304.  This phone number is listed on MAGANA's business Facebook Page for Forward Builders.

11

b.   MAGANA also listed an email address on the application as FORWARDBUILDERS7@GMAIL.COM.

31.   In order to qualify for a large loan amount, MAGANA submitted employee and payroll documentation supporting his claim that he had several employees and a large payroll; that documentation included IRS tax Forms 940 and 941.[1]

32.   In support of this application to U.S. Bank, MAGANA provided an IRS Form 940 (Employer's Annual Federal Unemployment (FUTA) Tax Return) for The Building Circle LLC for tax year 2019, which listed $4,500,000 in annual employee salary payments to 40 total employees.

33.   For further proof of employee payroll expenses, U.S. Bank requested MAGANA provide the quarterly (Q) 2019 Form 941 tax forms. In response to the bank's request, MAGANA provided quarters 1 through 4 (Q1-Q4) for 2020 on Form 941 for The Building Circle LLC.  Those Forms 941 for 2020 Q1 – Q4 appeared to be completed on same date because each form was dated April 7, 2020.

34.   MAGANA's signature was on all the Forms 940 and 941.

35.   Additionally, the underwriting packet did not include a list of employees or associates employed by The Building Circle, LLC.

36.   U.S. Bank personnel deemed these forms suspicious because the Form 941 tax forms are typically filed within 10 days following

_____

[1] Employers report their annual federal unemployment taxes ("FUTA") on the IRS form 940 to the IRS by January 31 of each year. Together with state unemployment tax systems, the FUTA tax provides funds for paying unemployment compensation to workers who have lost their jobs. Employers are also required to use the Form 941 to report income taxes, social security tax, or Medicare tax withheld from their employee's paychecks. The Form 941 is generally due by the last day of the month following the end of the quarter. For example, you're required to file Form 941 by April 30 for wages you pay during the first quarter, January through March.

the end of each quarter, but the forms from MAGANA indicated they covered all of calendar year 2020.  Based on my experience, it is not possible to have filed 2020 Form 941 tax forms for the business that include Q2-Q4 because Q2 did not end until June 30, 2020, and Q3 and Q4 had not yet occurred at the time MAGANA provided those tax documents.

37.  Additionally, wage amounts of $1,200,000, $1,100,000, $1,000,000, and $1,200,000 were provided for Q1-Q4, for a total of $4,500,000, which was also reflected on the 2019 Form 940 submitted by MAGANA.  Upon review of these records, I noticed that the Forms 941 quarterly tax forms were dated in 2020.  Based on my experience, it is not typical for a business to have a rounded salary expense number for one quarter and would be very unusual to have all four quarters with rounded numbers for wages.

38.  Based upon my training and experience, Form 941 tax forms are typically filed within 10 days following the end of each quarter. It is not possible to have filed 2020 Form 941 tax forms for the business that include Q2-Q4 because Q2 did not end until 06/30/2020 and Q3 and Q4 had not yet occurred.  Additionally, when the bank asked for 2019 Form 941, MAGANA provided Form 941 for 2020 in support of his Form 940 for 2019.

39.  In addition to the objective indicia of fraud, as discussed above, those tax forms were not filed with the IRS, and thus, appear to be fabricated.

a.  As provided above, California EDD confirmed that there is no registered business under the name of The Building Circle LLC or any business registered under MAGANA in the EDD records.  EDD explained that if they are not registered, that means that the

company has no record of having and or paying employees in the State of California.

       b.   Additionally, IRS tax records show that no Form 940 or Form 941 was ever filed for The Building Circle LLC.  The forms submitted to U.S. Bank had the word "Filed" in large letters over each page.  These forms appeared to have been electronically prepared but contained MAGANA's signature.

    40.   Internet research on The Building Circle LLC revealed that the business address appears to be a home-based property with very little online presence.  Based upon that information, I formed the conclusion that it would be highly unusual for such a business to be paying employee wages to 40 employees, much less wages totaling $4,500,000 annually.

    41.   Furthermore, on or about August 6, 2020, I conducted a drive-by surveillance of the address listed for The Building Circle LLC - 4340 Lindell Ave., Pico Rivera, CA 90660.

       a.   According to public records, that address is a residential single-family residence of approximately 980 square feet.

       b.   During my surveillance, I observed that this address is a small house that appeared to be a residence, and not a business.

       c.   During my surveillance, I observed and verified that G.P. and J.P. reside at this address.

    42.   U.S. Bank also noted that no construction license could be located for The Building Circle LLC, which furthered their suspicion of fraud.

    43.   On June 2, 2020, U.S. Bank denied that PPP loan application by MAGANA for The Building Circle, LLC, due to the presence of suspicious activity.

44.   U.S. Bank provided the IP Address that was used to submit the PPP application.  As discussed below, that IP address is registered to MAGANA at SUBJECT PREMISES#1.

**E.**   **06/03/2020: MAGANA submitted false information and fabricated tax documents submitted to Kabbage/Customers Bank in a PPP loan application for more than $900,000 in name of The Building Circle, LLC, which was approved and funded.**

45.   On or about June 3, 2020, MAGANA submitted an application for a PPP loan to Kabbage, Customers Bank's PPP vendor, on behalf of the same entity from the 05/14/20 loan application (The Building Circle LLC), for a total loanable amount of $940,416.

46.   MAGANA signed the application by electronic signature dated June 3, 2020, and listed his title as "Owner."

47.   On the application, MAGANA is listed as the 100% Owner with a home address of 4340 Lindell Ave, Pico Rivera, California 90660.

a.   MAGANA's Driver's License listed a different address, 27135 Silver Oak Ln, Apt 1722, Santa Clarita, California 91387.

b.   The loan application listed the address for The Building Circle LLC 4340 Lindell Ave, Pico Rivera, California 90660.

48.   In that application, entitled "Paycheck Protection Program Borrower Application Form," MAGANA represented that The Building Circle LLC's average monthly payroll was $376,167, and that it had 40 employees.

49.   In that application, MAGANA initialed next to the statement: "The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC."

50.   In support of that application, MAGANA submitted several

tax documents, including:

a.   2019 W-3, Transmittal of Wage and Tax Statements, for The Building Circle LLC, which listed $4,402,000 in Wages, tips, and other compensation paid (box 1), $402,589 in federal income tax withheld (box 2), and 40 total number of Forms W-2 transmitted (box c).

b.   2020 Form 941 (Employer's QUARTERLY Federal Tax Return) for the first quarter (Jan., Feb., and March) for The Building Circle LLC, which reported 40 employees who received wages, tips or other compensation (line 1), $852,000 in wages, tips, and other compensation (line 2), and $153,360 in Federal income tax withheld (line 3).

i.   The form has the word "Filed" on every page.

ii.   The form has a signature for MAGANA, dated April 7, 2020, and lists his title as "Manager."  Based upon my review of MAGANA's California driver's license, the signature on the 2020 Form 941 appears to match the signature on MAGANA's driver's license.

iii.   The form has a Form 941-V (Payment Voucher) in the amount of $283,686.

c.   MAGANA's signature was on the Form 941. I compared MAGANA's signature from his California driver's license to the Forms 940 and 941 that were submitted, and it appears that the signature on the tax forms matches MAGANA's signature on his driver license.

51.   Unlike the loan application that MAGANA had filed with U.S. Bank the month before (May 2020), Customers Bank approved and funded the loan to an account held by MAGANA, which he had at U.S. Bank. Specifically, on or about June 4, 2020, the loan was funded by Customers Bank by wire transfer of $940,416 through Wells Fargo Bank.

Kabbage originates their ACH transactions through Wells Fargo.  The loan was approved and as a result, $940,416 was deposited in an account held by MAGANA at USB.)  The loan number was xxxxxx67807.

52.  On June 15, 2020, Customers Bank Fraud Prevention and Investigations unit ("FPI") received contact from U.S. Bank to discuss concerns after they discovered that PPP loan proceeds were deposited into an account MAGANA held at U.S. Bank.  U.S. Bank revealed to Customers Bank that they had previously declined a PPP loan related to MAGANA due to suspicious customer identification documents from this borrower.

53.  On June 17, 2020, FPI representatives spoke with U.S. Bank. U.S. Bank explained why they had previously declined a PPP loan to MAGANA, specifically they discussed the submission of suspicious tax forms that had been provided by MAGANA. U.S. Bank told FPI that MAGANA had provided four quarters of Forms 941 for the entire year of 2020.

54.  Customers Bank began a second review of MAGANA's loan application and the supporting documentation he had provided. They found that he had submitted first quarter wages for 2020 of $1,200,000.  U.S. Bank informed Customers Bank that MAGANA had provided them with first quarter 2020 wages paid of $852,000. Customers Bank determined that this discrepancy was suspicious. Additionally, the 2020 Forms 941s submitted to Kabbage and U.S. Bank – each with different purported amounts of wages paid to employees – were marked "filed" dated on the same date - April 7, 2020.

55.  Additional red flags revealed MAGANA appeared to have submitted both loan applications to U.S. Bank and Customers Bank for the same business around the same time.

56.   U.S. Bank told Customers Bank that they had placed a hold on the funds and advised Customers Bank to work with Wells Fargo to recover the funds from U.S. Bank.  On or about July 30, 2020, U.S. Bank wired back $940,416 to Customers Bank through Wells Fargo Bank. However, prior to returning the funds U.S. Bank contacted MAGANA's to get his consent to return the money back to Customers Bank.

57.   <u>Interview of U.S. Bank Branch Manager A.M.</u>: On August 5, 2020, I interviewed A.M., U.S. Bank Manager for the Burbank branch. A.M. stated that on or about July 9, 2020, she spoke with MAGANA on the phone, and she related that conversation to me.

a.   MAGANA identified himself as the signer of the PPP Loan application affiliated with the PPP loan from Customers Bank.

b.   A.M. told MAGANA that Wells Fargo Bank had sent the PPP loan funds in error.

c.   A.M. recalled that MAGANA was very confused and asked why Wells Fargo Bank was involved.  MAGANA told A.M., "We have all the documents, we got approved."

d.   MAGANA also stated that he would not consent to sending the money back.

e.   A.M. did not know about the fraud at the time she was asked to call MAGANA.

f.   A.M. stated that MAGANA was annoyed and confused on the phone.

g.   A.M. ended the phone call by telling MAGANA that she would have to contact the back office and get back to him.

h.   She did not speak to MAGANA again.

i.   The funds were restricted and subsequently sent back to Customers Bank.

58.   In addition to the objective indicia of fraud, as discussed above, the tax forms that MAGANA submitted with this application were not filed with the IRS, and thus, appear to be fabricated.

a.   As provided above, California EDD confirmed that there is no registered business under the name of The Building Circle LLC or any business registered under MAGANA in the EDD records.  EDD explained that if they are not registered, that means that the company has no record of having and or paying employees in the State of California.

b.   Additionally, IRS tax records show that no Form 940 or Form 941 was ever filed for The Building Circle LLC.  The forms submitted to U.S. Bank had the word "Filed" in large letters over each page.  These forms appeared to have been electronically prepared but contained MAGANA's signature.

**F.   April and May 2020: Five other fraudulent PPP loan applications totaling more than $1,500,000 to Bank of America by MAGANA and/or GOLDSTEIN (approximately $1,000,000 issued/funded)**

59.   I obtained and reviewed documents received from BofA and SBA related to PPP loans submitted by MAGANA and GOLDSTEIN, and discovered that they had continued to submit multiple PPP loan applications to Bank of America (BofA).

60.   Based on internet research and California Secretary of State Business Record, I discovered that GOLDSTEIN and MAGANA are business partners. For example, California Secretary of State business records for Antelope Valley Residential Development, LLC, list MAGANA as the Chief Executive Officer and Goldstein as Manager; this document was filed on March 2, 2017.

61.   The chart below summarizes the PPP loans MAGANA and

Goldstein applied for with BofA in April and May 2020:

| DATE APPLICATION SUBMITTED | NAME OF BUSINESS | PERSON SUBMITTING LOAN | REQUESTED LOAN AMOUNT | STATUS |
|---|---|---|---|---|
| 04/05/20 | Beagle Real Estate Investments, LLC | GOLDSTEIN | $275,000 | Denied |
| 04/13/20 | Beagle Real Estate Investments, LLC | GOLDSTEIN | $300,000 | Denied |
| 05/02/20 | Beagle Real Estate Investments, LLC | GOLDSTEIN | $355,000 | Approved/ Disbursed |
| 05/05/20 | Antelope Valley Residential Development, LLC | GOLDSTEIN | $300,000 | Approved/ Disbursed |
| 05/13/20 | Forward Builders LLC | MAGANA | $360,415 | Approved/ Disbursed |

62.  On or about April 5, 2020, GOLDSTEIN submitted a PPP loan application to BofA for Beagle Real Estate Investments for a loan of $275,000.

    a.  As discussed below for the PPP loan application on May 2, 2020, GOLDSTEIN submitted fabricated tax documents and fraudulent information to attempt to obtain this loan.

    b.  BofA denied this loan.

63.  On or about April 13, 2020, GOLDSTEIN submitted a PPP loan application to BofA for Beagle Real Estate Investments for a loan of $300,000.

    a.  As discussed below for the PPP loan application on May 2, 2020, GOLDSTEIN submitted fabricated tax documents and fraudulent information to attempt to obtain this loan.

    b.  BofA denied this loan.

64.  On or about May 2, 2020, GOLDSTEIN submitted a PPP loan application to BofA for Beagle Real Estate Investments for a loan of

$355,000.

       a.   The loan application listed that the average monthly payroll was $120,000.

       b.   The loan application listed that the number of employees employed was 43.

       c.   The loan application checked the box for yes for the statement that the applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC

       d.   In support of that loan application, GOLDSTEIN submitted to BofA a 2019 Form 940 (Employer's Annual Federal Unemployment (FUTA) Tax Return) for Beagle Real Estate Investments dated February 24, 2020.

         i.   That tax form reported payments of $1,704,000 to employees.

         ii.   It was also stamped "Filed" on the first page.

       e.   In support of that loan application, GOLDSTEIN also submitted a 2020 Form 941 (Employer's QUARTERLY Federal Tax Return) for the first quarter of 2020 (Q1).

         i.   This was dated April 1, 2020, and reported $308,000 in wages paid to 13 employees.

         ii.   On page 2, it has a signature for GOLDSTEIN, dated April 1, 2020, where in the box for "title," it lists his position as "Manager."

       f.   The dates on the Forms 940 and 941 for Beagle Real Estate Investments are similar to the dates on the Forms 940 and 941 submitted by MAGANA for Forward Builders, LLC, to BofA.

       g.   GOLDSTEIN provided his phone number, (818) xxx-6594.

As previously mentioned, this is one of the phone numbers that MAGANA provided to BofA when applying for PPP loans for Forward Builders, LLC.

   h. On or about May 4, 2020, the $355,000 loan for Beagle Real Estate Investments was disbursed by BofA to BofA account number XXXXXXXX3684.

    i. I obtained and reviewed the bank records for that account from BofA and learned that GOLDSTEIN had opened that account on October 22, 2015.

    ii. That account is a business account opened in the name of Beagle Real Estate Investments.

    iii. GOLDSTEIN is the only signatory on the account.

    iv. The address listed on the bank account is a Post Office box in Northridge, California.

   i. That same day, May 4, 2020, after the $355,000 loan had been issued and deposited into BofA account ending in 3684, GOLDSTEIN then transferred the funds out into his personal account, using two transfers:

    i. GOLDSTEIN transferred $300,000.32 from that account ending in 3684 into his BofA personal checking account ending in 1866.

    ii. GOLDSTEIN then transferred $55,000 from that account ending in 3684 into his BofA personal checking account ending in 1866.

  65. On or about May 5, 2020 (several days after GOLDSTEIN had submitted a PPP loan application to BofA for $355,000 for Beagle Real Estate Investments), GOLDSTEIN submitted a loan application to BofA for Antelope Valley Residential Development, LLC, for $300,000.

1        a.   This loan application was approved and the funds

2   ultimately disbursed by BofA on or about May 11, 2020.

3              i.   BofA disbursed $300,000 to BofA account number

4   XXXXXXXX2683 in the name of Antelope Valley Residential Development,

5   LLC.

6              ii.   On or about May 11, 2020, the same day that that

7   $300,000 from the PPP loan was deposited into BofA account ending in

8   2683, MAGANA then transferred $67,000 from Antelope Valley's account

9   ending in 2683 into his BofA personal checking account ending in

10  3556.

11                 1.   On or about June 12, 2020, a cash withdrawal

12  of $8,500 was made from MAGANA's BofA personal checking account

13  ending in 3556.

14                 2.   On or about June 17, 2020, a cash withdrawal

15  of $9,000 was made from MAGANA's BofA personal checking account

16  ending in 3556.

17          iii.   Also on or about May 11, 2020, GOLDSTEIN then

18  transferred $67,000 from Antelope Valley's account ending in 2683

19  into his BofA personal checking account ending in 6731.

20          iv.   Also on or about May 11, 2020, GOLDSTEIN then

21  transferred $17,252.30 from Antelope Valley's account ending in 2683

22  into his BofA personal checking account ending in 6731.

23        b.   According to IRS records, GOLDSTEIN is MAGANA's

24  business partner for Antelope Valley Residential Dev LLC.   According

25  to California State Incorporation records, MAGANA is listed as the

26  Chief Executive Officer and GOLDSTEIN is listed as the Manager.

27        c.   On the application, GOLDSTEIN was listed as the

28  Authorized Representative.   For both the business address and

                                   23

personal address, GOLDSTEIN listed his address as 5280 East Beverly Blvd, Suite 397, Los Angeles CA 90022.  This address is the same address used by MAGANA on PPP loan applications for Forward Builders, LLC.

      d.   GOLDSTEIN listed his phone number as (818) xxx-6594 on the loan application.  This is one of the phone numbers MAGANA provided to BofA for Forward Builders, LLC, as detailed elsewhere in this Affidavit.

      e.   On the loan application addendum, GOLDSTEIN reported the average monthly payroll was $120,000.

      f.   The loan application addendum had checked boxes for the following statement under "Certifications":

          i.   "The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC."

          ii.   "The funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; as specified under the Paycheck Protection Program Rule.  I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

      g.   In support of the application, GOLDSTEIN also provided a 2020 Form 941 for Antelope Valley Residential Development LLC for the first quarter of 2020, also dated April 1, 2020.

          i.   That tax form reported $102,500 in wages paid to 11 employees.

          ii.   On page 2, it has a signature for GOLDSTEIN, where in the box for "title," it lists his position as "Manager."

24

iii.   I compared the signature on this Form 941 to the California driver's license for GOLDSTEIN, and they appear to match.

h.   In support of the application, GOLDSTEIN also submitted a 2019 Form 940 (Employer's Annual Federal Unemployment (FUTA) Tax Return) for Antelope Valley Residential Development LLC, dated February 21, 2020.

i.   That tax form reported payments to employees of $1,534,870.

ii.   It was also stamped "Filed" on all pages.

iii.   On page 2, it has a signature for GOLDSTEIN, dated February 21, 2020, where in the box for "title," it lists his position as "Manager."

iv.   I compared the signature on this Form 940 to the California driver's license for GOLDSTEIN, and they do not appear to match.

i.   The dates on the Forms 940 and 941 for Beagle Real Estate Investments are similar to the dates on the Form 940 and Form 941 submitted by MAGANA for Forward Builders, LLC.

66.   On or about May 13, 2020, MAGANA submitted loan application for Forward Builders, LLC for $360,415, which was an increased amount from previous amounts he had sought for this same loan application. Based upon this loan request, BofA disbursed that amount that same day, May 13, 2020.

a.   The bank account used to receive this $360,415 disbursement is the same bank account owned by MAGANA and GOLDSTEIN, which had been used to receive the $300,000 loan for Antelope Valley Residential Dev LLC, as discussed above.

b.   On or about May 13, 2020, the same day that that

$360,415 from the PPP loan was deposited into BofA account ending in 2683, MAGANA then transferred $357,500 from that account ending in 2683 into his BofA personal checking account ending in 3556.

c.    In support of the application, MAGANA submitted a 2019 Form 940 dated February 21, 2020.

i.    That Form 940 reported payments of $1,730,000 to employees.

ii.    On page 2 of that Form 940, there is a signature for MAGANA, where his title is listed as "Manager."  I compared that signature to MAGANA's signature on his California driver's license, and they appear to match.

iii.    The form was also stamped "Filed" on the first page.

iv.    MAGANA also provided a 2020 Form 941 for the first quarter of 2020; this form was dated April 2, 2020 and reported $294,000 in wages paid to 13 employees.

d.    As detailed above, California EDD confirmed that there is no business under the name Forward Builders, LLC, registered with them or any business registered under MAGANA's name in EDD records. EDD explained that if a company or individual is not so registered, that means that the company has no record of having and/or paying employees in California.

e.    Also as detailed above, IRS records confirmed that no Forms 940 or 941 have been filed by Forward Builders, LLC.

f.    MAGANA provided two different phone numbers, (323) xxx-0304 and (818) xxx-6594.  I believe phone number (323) xxx-0304 to be MAGANA's cell phone number.  This is the same phone number listed by MAGANA on the USB and Customers Bank PPP loan applications

for the BLDG Circle and the phone number that USB called to seek permission to return the PPP loan proceeds to Customers Bank.  I also confirmed that this phone number is listed on MAGANA's business Facebook Page for Forward Builders.

g.   MAGANA listed the business address for Forward Builders, LLC, as 5280 East Beverly Blvd., Suite C 397, Los Angeles, CA 90022.  This address is CMRA and not a business office suite capable of maintain business records or office staff.  In or about August 6, 2020, I interviewed an employee at this CMRA, who told me that MAGANA is the registered mailbox owner of mailbox number 397.

67.   Two of the loans discussed in the paragraphs above, one for Antelope Valley Residential Dev LLC for $300,000, which was submitted by GOLDSTEIN and the other for Forward Builders, LLC for $360,415 submitted by MAGANA, were disbursed by BofA to BofA account number xxxxxxxx2683.

a.   I received and reviewed the bank records provided by BofA and learned that account no. xxxxxxxx2683 belongs to MAGANA and GOLDSTEIN.

b.   According to BofA records, account no. xxxxxxxx2683 was opened by MAGANA and GOLDSTEIN on December 14, 2016.  Both MAGANA and GOLDSTEIN are on the signature card and listed as managers of Antelope Valley Residential Dev LLC, which is listed as a business account.

G.   **Address Information – SUBJECT PREMISES#1 and SUBJECT PREMISES#2**

68.   The chart below summarizes the addresses listed on the PPP loans submitted by MAGANA and GOLDSTEIN to U.S. Bank, Customers Bank (Kabbage), and BofA:

| DATE PPP APPLICATION FILED WITH BANK | BANK | BORROWER | ADDRESS |
|---|---|---|---|
| 04/05/20 | Bank of America | Beagle Real Estate | SUBJECT PREMISES#2 |
| 04/05/20 | Bank of America | Forward Builders LLC | SUBJECT PREMISES#1 |
| 04/13/20 | Bank of America | Beagle Real Estate | SUBJECT PREMISES#2 |
| 05/02/20 | Bank of America | Beagle Real Estate | SUBJECT PREMISES#2 |
| 05/05/20 | Bank of America | Antelope Valley Residential Dev LLC | 5280 East Beverly Blvd., Suite 397, Los Angeles CA 90022 |
| 05/14/20 | U.S Bank | Building Circle LLC | 4340 Lindel Ave., Pico Rivera, CA 90660 |
| 06/03/20 | Customers Bank | Building Circle LLC | 4340 Lindel Ave., Pico Rivera, CA 90660 |

69.  On or about August 6, 2020 I conducted surveillance and research of the residential property located at 4340 Lindel Ave., Pico Rivera, California 90660.  This address was listed as the address for The Building Circle, LLC, on the application to Customers Bank and U.S. Bank.  I learned the following:

a.   According to public records, the address is a residential single-family residence of approximately 980 square feet.

b.   During my surveillance, I observed that this address is a small house that appeared to be a residence, and not a business.

c.   During my surveillance, I observed and verified that G.P and J.P. reside at this address.

70.  On or about August 6, 2020, IRS-CI Supervisory Special Agent Adrian Yepez conducted surveillance on 27135 Silver Oak Ln., Apt. 1722, Santa Clarita, CA 91387.  This address is listed as MAGANA's home address on his California Driver License.  Neither MAGANA nor his known registered vehicles were observed at this

location.

71.   On or about August 6, 2020, I conducted surveillance of 219 S. Westcott Ave., Los Angeles, CA 90022.

a.   According to public records, that address is a residential single-family residence of approximately 1,218 square feet.

b.   During my surveillance of that location, I observed that this address is a small house that appeared to be a residence, and not a business.

c.   A dark green Honda bearing California license plate HNRX909 was parked outside.  Based upon my review of California DMV records, this vehicle is registered to MAGANA.

d.   During my surveillance at this location on August 6, 2020, I did not see MAGANA at this location.

72.   On August 6, 2020, I went to 5280 East Beverly Blvd., Ste. C 397, Los Angeles, California 90022.

a.   This address is located approximately half a mile away from 219 S. Westcott Ave., Los Angeles, California 90022.

b.   This address was listed on the PPP loan application for Forward Builders, LLC, at the time it was submitted to BofA.

c.   I observed that this location is not a business suite. Rather, it is actually a Commercial Mail Receiving Agency by the name of Postal Annex.

73.   On or about August 6, 2020, I interviewed the manager of the location, R.M.  R.M. confirmed that MAGANA is the registered owner of mailbox #397.

a.   She identified MAGANA from pictures that I showed her.

b.   She stated that she has not seen MAGANA in person in about

2 months, but when she did see him recently, he had gained weight.

      c.   R.M. was shown a picture of the dark green Honda, bearing California license plate HNRX909.  R.M. stated that this is the car that MAGANA would always show up in when he came to pick up his mail.

      d.   R.M. stated MAGANA receives a lot of mail addressed to entities named Forward Builders and Antelope Valley.

      e.   During the interview, R.M. removed mail that was currently in MAGANA's mailbox. I examined the letters and found letters addressed to Forward Builders and MAGANA from JPMorgan Chase Bank, Los Angeles Department of Water and Power, the San Bernardino Finance Department for business registration, and Bartlet Tree.

    74.   On or about the same date (August 6, 2020) and while I was at the Postal Annex interviewing R.M., IRS-CI SSA Yepez was conducting surveillance of SUBJECT PREMISES#1.

      a.   SUBJECT PREMISES#1was listed by MAGANA on the PPP application for Forward Builders, LLC.

      b.   According to public records, SUBJECT PREMISES#1 is a residential single-family residence of approximately 1,196 square feet.

      c.   IRS-CI SSA Yepez observed that SUBJECT PREMISES#1 is a small residence, and not a business.

      d.   At approximately 10:30 a.m., IRS-CI SSA Yepez observed a man similar in appearance to MAGANA at SUBJECT PREMISES#1.

      e.   At approximately 10:35 a.m., IRS-CI SSA Yepez saw the same man enter a white Honda Civic bearing California license plate 8LWX744.

      f.   IRS-CI SSA Yepez then sent pictures to me of the man whom he saw get into the white Honda Civic.

g.   I then showed R.M. the pictures and asked if she recognized the person in the photographs.  R.M. stated that the man in the photographs taken by IRS-CI SSA Yepez looked like MAGANA, and again she stated that MAGANA has gained some weight.

75.  On or about October 2, 2020, I conducted surveillance at SUBJECT PREMISES#1.  While I was there, at approximately 9:00 a.m., I observed a man that fit the description and pictures of MAGANA exit the property.

76.  On or about October 16, 2020, IRS-CI Special Agent Connor Smith conducted surveillance at SUBJECT PREMISES#1.  At approximately 10:30 a.m., he observed a man that fit the description and pictures of MAGANA exit the property and enter the white Honda Civic described above.

**H.   There is probable cause to search SUBJECT PREMISES#1.**

77.  As described above, SUBJECT PREMSIES#1 is a single legal lot with a single residential structure on it and its use type is listed as Single-Family Residence.  I believe there is probable cause to search this residence, as summarized below.

a.   The Los Angeles County Assessor's office stated that this address is listed as owned by Forward Builders, LLC.

b.   I further conducted a search of ownership online using the California Secretary of State Business website. I found that MAGANA requested a business license for Forward Builders, LLC on or about February 22, 2016.  MAGANA is listed as the Chief Executive Officer and the address 5280 E. Beverly Blvd. Suite C#397, Los Angeles, CA 90012 is listed as the business location.  The type of business activity described in the state filings for this company is "Real Estate Investments".

31

1          c.    SUBJECT PREMISES#1 was purchased on or around April

2    2019.

3       78.  As described above, MAGANA submitted multiple fraudulent

4    PPP loans to banks, which included attaching fabricated tax records.

5       79.  On one loan application, MAGANA stated to U.S. Bank that

6    his home address was SUBJECT PREMISES#1, and the business address for

7    The Building Circle, LLC, was SUBJECT PREMISES#1.

8       80.  In two out of three of his loan applications to BofA,

9    MAGANA listed that his home address was SUBJECT PREMISES#1.

10      81.  Records I received from BofA, U.S. Bank, and Customers Bank

11   listed that IP Address 172.91.243.222 was used to transmit the

12   following PPP loan applications submitted by MAGANA, which were

13   described above:

| DATE | BANK | BORROWER | AMOUNT | IP ADDRESS | ADDRESS |
|------|------|----------|--------|------------|---------|
| 05/13/20 | Bank of America | Forward Builders LLC | $360,415 | 172.91.243.222 | SUBJECT PREMISES#1 |
| 05/14/20 | U.S Bank | The Building Circle LLC | $937,000 | 172.91.243.222 | SUBJECT PREMISES#1 |
| 06/01/20 | Customers Bank | The Building Circle LLC | $940,416 | 172.91.243.222 | SUBJECT PREMISES#1 |

22      82.  On or about September 8, 2020, I received subscriber

23   information records from Charter Communications – Spectrum, which I

24   reviewed.  Those records showed that IP address 172.91.243.222 was

25   and still is registered to MAGANA at SUBJECT PREMISES#1.

26      83.  As detailed above, on or about August 6, October 2, and

27   October 16, 2020, agents conducted surveillance at SUBJECT PREMISES#1

28   where they observed an individual who appeared to be MAGANA.

32

I.   **There is probable cause to search SUBJECT PREMISES#2.**

84.   As described above, GOLDSTEIN submitted multiple fraudulent PPP loans to banks, which included attaching fabricated tax records.

85.   I obtained a copy of GOLDSTEIN's California driver's license, which lists SUBJECT PREMISES#2 as his address.

86.   On his 2019 individual tax return, filed on or about March 19, 2020, GOLDSTEIN listed his address as SUBJECT PREMISES#2.

87.   On all of the PPP loan applications for Beagle Real Estate Investments, LLC, GOLDSTEIN listed that his home address was SUBJECT PREMISES#2.

88.   Likewise, on the Forms 940 and 941 for Beagle Real Estate Investments, LLC, that were submitted in support of those PPP applications, the address for SUBJECT PREMISES#2 was used.

89.   Records I received from BofA showed that IP Address 104.173.17.229 was used to transmit the following PPP loan applications, which were detailed above:

| DATE | BANK | BORROWER | AMOUNT | IP ADDRESS | ADDRESS |
|------|------|----------|--------|------------|---------|
| 04/05/20 | BofA | Beagle Real Estate Investments, LLC | $275,000 | 104.173.17.229 | SUBJECT PREMISES#2 |
| 04/13/20 | BofA | Beagle Real Estate Investments, LLC | $300,000 | 104.173.17.229 | SUBJECT PREMISES#2 |
| 05/02/20 | BofA | Beagle Real Estate Investments, LLC | $355,000 | 104.173.17.229 | SUBJECT PREMISES#2 |
| 05/05/20 | BofA | Antelope Valley Residential Development, LLC | $300,000 | 104.173.17.229 | SUBJECT PREMISES#2 |

90.   On or about October 22, 2020, I received subscriber information records from Charter Communications – Spectrum, which I reviewed.  Those records showed that IP address 104.173.17.229 was and still is registered to GOLDSTEIN at SUBJECT PREMISES#2.

91.   On or about October 23, 2020, IRS-CI Special Agent John Lucero went to SUBJECT PREMISES#2 and observed a vehicle with California license plate 7NHG722 parked in the driveway.  According to California DMV records, that vehicle is registered to GOLDSTEIN and his wife with registration address at SUBJECT PREMISES#2.

**J.    TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES**

92.   Based on my experience and training, and based on my consultation with other law enforcement officers, I know that:

a.   Individuals involved in this type of fraud where the real identity of the perpetrator is used in furtherance of their scheme and there is no attempt to conceal their personal identifying information, can operate such schemes alone or in concert with others.  I am aware that individuals may represent that their co-conspirators perform a legitimate function, such as an accountant or manager, as the person who is responsible for their conduct in the scheme. In reality, the person identified as the accountant or manager for example, is an individual who is higher in the criminal hierarchy of the organization. Often times the individual with good credit and or no prior criminal history is recruited to be the face of the scheme.

b.   Individuals involved in fraud schemes like this one usually keep evidence of their schemes, such as pay-owe sheets for dividing the proceeds, contact information for their co-conspirators, and records documenting the scheme (such as tax forms) so when an

error is made, they can recreate the documentation needed to help conceal the fraud.

c. These individuals often use the proceeds of the fraud to purchase expensive items or store the proceeds in the form of cash to make it more difficult to trace.

d. Individuals involved in fraud schemes need to communicate with their co-conspirators about their fraudulent activity. There are usually records of those communications in their electronic devices such as cellular telephones.

e. Typically, they maintain the evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their residences and vehicles. Such individuals commonly use digital devices to communicate with their fellow participants by phone, email and text messages. I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded. Computers, tablets and cell phones can be used to communicate between co-conspirators and may contain information relating to the crime under investigation.

f. I know from training and experience that individuals involved in fraud keep the most damaging evidence and/or proceeds of the scheme at their residences, vehicles, garages and to help conceal the fraud from their fellow coworkers who may have access to such documents at the workplace. Proceeds such as cash and gifts are easier to conceal at the fraudster's residence rather than in plain view of coworkers. More sophisticated or cagey criminals may rent public storage units to use to further distance themselves from

incriminating evidence, or safety deposit boxes, especially when storing valuables such as cash.

93.   The fraudulent PPP loan applications submitted by MAGANA and GOLDSTEIN attached electronically prepared tax forms, and the applications were submitted and/or prepared electronically.  I know that individuals often use their personal digital devices to create tax documents, as well as to transmit applications electronically, and that they often maintain copies of those digital documents for use later.

94.   The Forms 940 and 941 that MAGANA submitted to BofA, U.S. Bank, and Customers Bank all indicated that they were self-prepared. Based on my experience and training with IRS-CI and based on my consultation with other IRS personnel, it is normal for a business to have Forms 940 and 941 prepared by a Certified Public Accountant or professional return preparer, particularly when a business has numerous employees or is paying millions of dollars in wages.

**K.**   **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

95.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital

data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single

37

megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced

with more recently downloaded or viewed content.  Thus, the ability
to retrieve residue of an electronic file from a hard drive depends
less on when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive requires
specialized tools and a controlled laboratory environment.  Recovery
also can require substantial time.

            e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents (such
as word processing, picture, and movie files), digital devices can
contain other forms of electronic evidence as well.  In particular,
records of how a digital device has been used, what it has been used
for, who has used it, and who has been responsible for creating or
maintaining records, documents, programs, applications and materials
contained on the digital devices are, as described further in the
attachments, called for by this warrant.  Those records will not
always be found in digital data that is neatly segregable from the
hard drive image as a whole.  Digital data on the hard drive not
currently associated with any file can provide evidence of a file
that was once on the hard drive but has since been deleted or edited,
or of a deleted portion of a file (such as a paragraph that has been
deleted from a word processing file).  Virtual memory paging systems
can leave digital data on the hard drive that show what tasks and
processes on the computer were recently used.  Web browsers, e-mail
programs, and chat programs often store configuration data on the
hard drive that can reveal information such as online nicknames and
passwords.  Operating systems can record additional data, such as the
attachment of peripherals, the attachment of U.S. Bank flash storage

39

devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and can require substantial time.

96.  Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time.

97.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be

40

necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

          b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

     98.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

### V. CONCLUSION

99.  For all the reasons described above, there is probable cause to believe that MAGANA and GOLDSTEIN violated the Subject Offenses.

100. Further, based upon the facts described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found at SUBJECT PREMISES#1 and SUBJECT PREMISES#2, as described in Attachments A-1 and A-2, respectively.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>27th</u> day of October 2020.

**DOUGLAS F. McCORMICK**
_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE