TRACY L. WILKISON
United States Attorney
BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office
CHARLES E. PELL (Cal. SBN 210309)
Assistant United States Attorney
Santa Ana Branch Office
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone: (714) 338-3542
    Facsimile: (714) 338-3561
    E-mail:   charles.e.pell2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:21-cr-00007-SB |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT RAYMOND MAGANA |
| v. | |
| RAYMOND MAGANA, | Hearing Date: January 25, 2022 |
| Defendant. | Hearing Time: 8:30 a.m. |

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Charles E. Pell, hereby files its sentencing position for defendant Raymond Magana.

///

///

///

1       This sentencing position is based upon the attached memorandum

2   of points and authorities, the under seal exhibit, the files and

3   records in this case, and such further evidence and argument as the

4   Court may permit.

5   Dated: January 10, 2022          Respectfully submitted,

6                                    TRACY L. WILKISON
                                     United States Attorney
7
                                     BENJAMIN R. BARRON
8                                    Assistant United States Attorney
                                     Chief, Santa Ana Branch Office
9

10                                   */s/ Charles E. Pell*
                                     CHARLES E. PELL
11                                   Assistant United States Attorney
                                     Santa Ana Branch Office
12
                                     Attorneys for Plaintiff
13                                   UNITED STATES OF AMERICA

TABLE OF CONTENTS

DESCRIPTION                                                        PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   BACKGROUND....................................................1

      A.    Procedural Background...................................1

      B.    Plea agreement..........................................2

      C.    Factual Background......................................3

            1.    Facts agreed to in the plea agreement.............3

            2.    Even though defendant succeeded in tricking
                  Kabbage/Customer's Bank to issue him a $940,416
                  loan that was deposited into his bank account at
                  U.S. Bank, U.S. Bank luckily froze those funds,
                  although defendant refused to agree to send the
                  funds back.......................................5

III.  GUIDELINES CALCULATION........................................6

      A.    The PSR's calculations and recommendation...............6

      B.    Loss amount.............................................7

      C.    Sophisticated means.....................................9

IV.   GOVERNMENT'S POSITION REGARDING SENTENCING...................11

      A.    Summary of the Government's Position...................11

      B.    Two level downward variance............................12

      C.    The § 3553(a) Factors Otherwise Call for a Guidelines
            Sentence...............................................12

            1.    Nature, Circumstances, and Seriousness of the
                  Offense.........................................13

            2.    Defendant's History and Characteristics.........14

            3.    Adequate Deterrence to Defendant and the Public..15

            4.    Need to Protect the Public from Defendant........16

            5.    Need to Avoid Unwarranted Sentence Disparities...17

      D.    Restitution............................................18

i

V.    CONCLUSION.......................................................18

# Table of Authorities

DESCRIPTION

**Federal Cases**                                                      Page(s)

United States v. Horob,
  735 F.3d 866 (9th Cir.2013) .................................. 10

United States v. Jennings,
  711 F.3d 1144 (9th Cir. 2013) ............................... 10

United States v. Lindsey,
  680 F. App'x 563 (9th Cir. 2017) ........................... 10

United States v. Miller,
  953 F.3d 1095 (9th Cir. 2020) .............................. 18

United States v. Tanke,
  743 F.3d 1296-08 (9th Cir.2014) ......................... 10, 11

United States v. Treadwell,
  593 F.3d 990 (9th Cir. 2010) ............................... 18

United States v. Young,
  537 F. App'x 777 (9th Cir. 2013) ........................... 10

**Federal Statutes**

18 U.S.C. § 1040 ............................................ 1, 2

18 U.S.C. § 3553 ....................................... 12, 13, 18

42 U.S.C. § 5191 .......................................... 3, 5, 6

**Other**

Rule 32 ......................................................... 4

Section 2B1.1 ............................................... 9, 10

**Sentencing Guidelines**

U.S.S.G. § 2B1.1 .......................................... 2, 6, 9

U.S.S.G. § 3E1.1 .......................................... 6, 7, 8

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Defendant Raymond Magana, with criminal history category III, exploited a federal government benefits program during the ongoing international crisis – the COVID pandemic.  Defendant tried to steal millions of dollars of taxpayer guaranteed funds intended to help people impacted by that pandemic, to which he was not entitled; his crime involved an intended loss exceeding $2,000,000, with actual loss of $360,415.  Applying the Section 3553(a) factors, including deterrence, defendant should be sentenced to years in prison.

The government agrees with the Guidelines calculations set forth by Probation, which found that defendant has a final offense level of 24 and criminal history category of III, resulting in an applicable Guidelines sentencing range of 63 to 78 months of imprisonment.

Based upon the facts, the government believes that a low end Guideline sentence, after applying a two-level downward variance for early acceptance of responsibility, is appropriate in this case: 51 months of imprisonment, five years of supervised release, and $360,415 restitution.

**II.   BACKGROUND**

**A.    Procedural Background**

On January 11, 2021, defendant was charged by criminal information with fraud in connection with major disaster and emergency benefits, in violation of 18 U.S.C. § 1040(a)(2).  (DE 34.)

On January 26, 2021, pursuant to a written plea agreement (DE 38), defendant pleaded guilty to the sole count of the information. (DE 41 (minutes of change of plea hearing).)

On April 6, 2021, the United States Probation Office disclosed

defendant's Presentence Investigation Report (PSR). (DE 43.)  The Probation Office has determined that defendant's total offense level is 24 and his criminal history category is III.  (Id. at 3.)  With said offense level of 24, the PSR calculated the resulting Guidelines sentencing range as 63 to 78 months' imprisonment, two to five years of supervised release, and a fine of $20,000 to $200,000.  (Id.)  In its disclosed recommendation letter, the Probation Officer recommends a below Guidelines sentence of 51 months of imprisonment, to be followed by five years of supervised release, and restitution of $360,415.  (DE 42 at 1-2.)

### B.   Plea agreement

Defendant pleaded guilty to the single count information against him. (PSR ¶ 1.)  That information charges defendant with violating Title 18, United States Code, Section 1040(a)(2). (Id. ¶ 2.)  The statutory maximum sentence that the Court can impose for a Section 1040(a)(2) conviction is 30 years of imprisonment, a five-year period of supervised release, a fine of $250,000 (or twice the gross gain or gross loss resulting from the offense), and a mandatory special assessment of $100.

In the plea agreement, the parties stipulated that the following guidelines calculations are correct:

Base Offense Level:        7        U.S.S.G. § 2B1.1(a)(1)

Section 1040 conduct:     +2        U.S.S.G. § 2B1.1(b)(12)

(Id. ¶ 4; Plea Agreement ¶ 14.)  The parties left open whether additional specific offense characteristics, adjustments, and departures applied (id.), but the government agreed not to argue or seek a loss amount greater than $2,237,831 (Plea Agreement ¶ 14).

C.  **Factual Background**

    1.  Facts agreed to in the plea agreement

Defendant agreed to the following facts as part of the plea agreement and change of plea hearing:

- On March 13, 2020, President Donald J. Trump declared an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5191(b), which authorized assistance for COVID-19 response efforts for all U.S. states, territories, and the District of Columbia.  The Coronavirus Aid, Relief, and Economic Security (CARES) Act is a federal law enacted in around March 2020 and was designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program (PPP).  Around April 2020, Congress authorized over $300 billion in additional PPP funding.  In December 200, Congress authorized more than $250 billion in additional PPP funding.

- In May and June 2020, defendant submitted applications for PPP loans to banks, which contained false statements about the number of employees and the amount of employee payroll expenses.  Those false statements were material because to qualify for PPP loans, those employee-related figures are used to calculate whether the business qualifies for a PPP loan, as well as to determine the amount of PPP funds the business is eligible to receive.

- Specifically, on or about June 3, 2020, defendant submitted a PPP loan application to Kabbage, Customers Bank's PPP

vendor, for $940,416 for entity The Building Circle LLC.  In support
of that PPP loan application, defendant listed that the average
monthly payroll was $376,167, and that the number of employees was
40.  Defendant knew that those statements were false.  Further, in
support of that loan application, defendant also submitted a 2019
Form W-3 (Transmittal of Wage and Tax Statements) for The Building
Circle LLC, which reported $4,402,000 in Wages, tips, and other
compensation paid, $402,589 in federal income tax withheld, and 40
total number of Forms W-2 transmitted for 2019, and also submitted a
2020 Form 941 (Employer's QUARTERLY Federal Tax Return) for the first
quarter (Jan., Feb., and March 2020) for The Building Circle LLC,
which reported $852,000 in wages, tips, and other compensation paid
to 40 employees, with $153,360 in federal income tax withheld for
that quarter.  Defendant knew that those tax documents were
fabricated and contained false information.  That fraudulent loan
application was approved, and on or about June 4, 2020, Customers
Bank disbursed $940,416 of PPP loan proceeds to the bank account
provided by defendant in the loan application.  The funds in that
bank account were frozen, and they were never disbursed to defendant.

- Defendant also submitted other PPP loan applications
in 2020, which he knew also contained similar false statements and/or
attached similar fabricated tax documents.  One such loan application
was approved, and Bank of America disbursed $360,415 as a result.
The authorization, transportation, transmission, transfer,
disbursement, or payment for the PPP loans submitted by defendant in
May and June 2020 was in or affected interstate or foreign commerce.

- The parties believe that the actual loss from the two
loans that were approved and disbursed is approximately $360,415.

4

(DE 38 at 11-12.)

> 2. **Even though defendant succeeded in tricking Kabbage/Customer's Bank to issue him a $940,416 loan that was deposited into his bank account at U.S. Bank, U.S. Bank luckily froze those funds, although defendant refused to agree to send the funds back.**

As described in the factual basis of defendant's plea, on June 3, 2020, defendant submitted an application for a $940,416 PPP loan to Kabbage, Customers Bank's PPP vendor, on behalf of The Building Circle LLC. That loan had false information and submitted fabricated tax documents. Unfortunately, that fraudulent loan application was approved, and on or about June 4, 2020, Customers Bank disbursed $940,416 of PPP loan proceeds to the bank account provided by defendant in the loan application, which was at U.S. Bank.[1]

Defendant never was able to access or withdraw those funds, because the receiving bank, U.S. Bank, froze them.

Shortly after those funds hit defendant's bank account at U.S. Bank, U.S. Bank altered Customers Bank's fraud department because the month before, U.S. Bank had declined a previous PPP loan application submitted by defendant, due to suspected fraud. (DE1 ¶¶ 52-53.) U.S. Bank told Customers Bank that they had placed a hold on the funds and advised Customers Bank to work with Wells Fargo to recover the funds from U.S. Bank. (Id. ¶ 56.) On or about July 30, 2020, U.S. Bank wired back $940,416 to Customers Bank through Wells Fargo Bank. (Id.)

---

[1] Customers Bank funded that loan by wire transfer of $940,416 through Wells Fargo Bank, because Kabbage originates its ACH transactions through Wells Fargo. (DE1 ¶ 51.)

5

1   However, prior to returning those funds, U.S. Bank contacted
2   defendant to obtain his consent to return the money back to Customers
3   Bank.  (Id.)

4   On August 5, 2020, a U.S. Bank manager spoke to defendant about
5   returning the funds.  (Id. ¶ 57.)  The manager told defendant that
6   the PPP funds had been sent in error, but defendant countered "We
7   have all the documents, we got approved."  (Id. ¶ 56b-c.)  Defendant
8   also stated that he would not consent to send the money back.  (Id.
9   ¶ 56d.)

10  **III. GUIDELINES CALCULATION**

11  **A.   The PSR's calculations and recommendation**

12  The PSR calculates defendant's Guidelines sentencing range as 63
13  to 78 months of imprisonment, based upon a total offense level of 24
14  and criminal history category of III.  (Id. at 3.)  The Probation
15  Officer recommends a below Guidelines sentence of 51 months of
16  imprisonment, to be followed by five years of supervised release, and
17  restitution of $360,415.  (DE 42 at 1-2.)

18  The PSR found that the intended loss was $1,230,000.  (DE 36
19  ¶ 40.)  The PSR's guidelines calculations are summarized as follows
20  (PSR paragraph identified in parentheses):

21  Base Offense Level:           7  U.S.S.G. § 2B1.1(a)(1) (¶ 29)
22  $1.5mm < Loss < $3.5mm:     +16  U.S.S.G. § 2B1.1(b)(1)(F) (¶ 32)
23  Sophisticated means:         +2  U.S.S.G. § 2B1.1(b)(10)(C) (¶ 34)
24  Section 1040 conduct:        +2  U.S.S.G. § 2B1.1(b)(12) (¶ 35)
25  Acceptance of Responsibility  −3  U.S.S.G. § 3E1.1 (¶¶ 41-42)
26  **Total Offense Level:        24**
27  Criminal History Cat.:      III
28  Guidelines Range:            63 to 78 months

The government does not object to any of the PSR's Guidelines level calculations, but discusses the loss amount and sophisticated means specific offense characteristics below, because those adjustments were not agreed to in the plea agreement.[2]

**B.   Loss amount**

In the plea agreement, the parties did not agree on the applicable loss amount: "The government believes that the intended loss from the PPP loan applications that defendant submitted is greater than $1,500,000 and less than $3,500,000, that is, approximately $2,237,831.  The defendant believes that the intended loss was $1,300,831."  (DE38 at 12-13).

The PSR found that the intended loss is $1,555,248, based upon three PPP loan applications filed by defendant.  (PSR ¶ 32.)  The PSR identified those three fraudulent loan applications as:

- $940,416 (The Building Circle LLC);
- $252,917 (Antelope Valley Residential Development);[3]
- $360,415 (Forward Builders, LLC)

(Id.).[4]  While the government believes the following additional loan does not change the Guidelines offense level found by the PSR,

---

[2] The government agrees that no role adjustment is applicable in this case.  (PSR ¶ 37.)

[3] The PSR notes that on a document submitted to Probation, defendant reported that he has a 50% ownership of Antelope Valley Residential Development LLC with partner Steven Goldstein.  (PSR at 7 n.2.) Defendant also provided Probation with the Form 1065 (U.S. Return of Partnership Income) for Antelope Valley Residential Development for 2019 and 2020 on which he is listed under Designation of Partnership Representative, and he and Goldstein are listed as each owning 50 percent.  (Id.)

[4] Antelope Valley Residential Development, LLC, was formed on December 5, 2016, and Raymond Magana is listed as a Chief Executive Officer, and Goldstein is listed as a Manager.  (Id. ¶ 13.)  Magana is the CEO of The Building Circle, LLC and Forward Builders, LLC. (Id. ¶ 14.)

7

because without that additional loan, the intended loss still falls in the $1.5mm to $3.5mm range, the government does believe that defendant did, in fact, submit that fraudulent loan application. That is, defendant also submitted the following additional loan application, which was ultimately denied by the bank:

- $937,000 (The Building Circle LLC).

The criminal complaint against defendant detailed this fraudulent loan application. (DE1 at 11-15). Specifically, on or about May 14, 2020, defendant submitted an application to U.S. Bank for a PPP loan in the amount of $937,000 on behalf of The Building Circle LLC. (Id. at 11.) Like the other PPP loan applications submitted by defendant, this loan application signed by defendant had false information as to number of employees (40) and annual employee salary payments ($4,500,000), and defendant also submitted fabricated federal tax forms. (Id. at 12.) Because of the indicia of fraud, the bank ultimately denied this loan application, so no funds were actually disbursed. (Id. at 13-14.) (As detailed in the plea agreement, defendant then turned around and submitted another application by The Building Circle LLC, increased to $940,416, to Bank of America, which did fund, but was frozen inside defendant's bank account.)

The government anticipates that the defense may argue that this May 2020 $937,000 loan application that he made for The Building Circle LLC should not be included in the loss amount, because that was basically the same amount ($940,416) for which defendant applied using the same entity in June 2020, so defendant really just wanted $940,000 for that entity, and not double that amount. Whether that was defendant's subjective intent is irrelevant for purposes of the loss. In May 2020, defendant submitted a fraudulent loan application

8

for $937,000 on behalf of The Building Circle LLC to U.S. Bank.  When that application was denied due to suspected fraud, defendant turned around and applied the next month in June 2020 with a different bank, Customers Bank, attempting to obtain $940,416 for that same entity. Thus, defendant made two separate fraudulent applications, at two different dates, submitted to two different victim banks. Accordingly, the amounts from both of those fraudulent loan applications should be included in the applicable loss amount.

Thus, the government agrees with the PSR that the 2B1.1 enhancement for loss is 16 levels based upon an attempted loss amount falling between $1.5mm and $3.5mm, but believes that the $937,000 loan application submitted by defendant in May 2020 should be included in the intended loss figure.[5]  Accordingly, the government requests that the Court find that the applicable loss amount is $2,237,831.

### C.   **Sophisticated means**

The PSR found that Section 2B1.1(b)(10)(C)'s two-level increase for "sophisticated means" applies.  (PSR ¶¶ 33-34.)

"For purposes of subsection (b)(10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Application Note 9(B), U.S.S.G. § 2B1.1.  In the Ninth Circuit, this enhancement does not require a highly complex or brilliant scheme.

---

[5] In the plea agreement, the government agreed not to argue or seek a loss amount greater than $2,237,831.  The government did not include the $252,917 loan in the applicable loss amount because that loan was submitted by Goldstein and not defendant.  Consistent with the approach it used with the sentencing of co-schemer Goldstein, the government cabined the loss amount to the loans actually submitted or signed by the respective schemer.

9

1    E.g., United States v. Jennings, 711 F.3d 1144, 1145 (9th Cir. 2013)

2    ("Conduct need not involve highly complex schemes or exhibit

3    exceptional brilliance to justify a sophisticated means

4    enhancement.").[6]   Nonetheless, this enhancement does require

5    something more than the mine run offense.  E.g., United States v.

6    Lindsey, 680 F. App'x 563, 567 (9th Cir. 2017) ("This enhancement

7    applies when the criminal scheme is extensively planned and is more

8    sophisticated than a routine offense.")  And that makes sense,

9    because otherwise, the enhancement would apply to almost all fraud

10   cases to which Section 2B1.1 otherwise applies.

11        The PSR's conclusion that the enhancement applies here is

12   supported by the facts.  In the plea agreement, defendant admitted

13   that he submitted multiple fabricated federal tax forms, including a

14   2019 Form W-3 (Transmittal of Wage and Tax Statements) and a 2020

15   Form 941 for The Building Circle LLC entity.  (DE38 at 12.)

16   Likewise, the PSR describes other fraudulent federal tax documents

17

18   _____

19        [6] See also United States v. Tanke, 743 F.3d 1296, 1307-08 (9th
     Cir.2014) ("Although Tanke did not use 'fictitious entities,
20   corporate shells, or offshore financial accounts,' as the Sentencing
     Commission's commentary contemplates, he created at least six false
21   invoices and falsified carbon copies of checks in Azteca's check
     register on at least 10 occasions to conceal the payments."); United
22   States v. Horob, 735 F.3d 866, 872 (9th Cir.2013) ("Horob did more
     than lie to obtain a loan. He manipulated several people to lie for
23   him, used several different bank accounts (including accounts of
     other people) to move funds around, and fabricated numerous
24   documents.  Moreover, the complicated and fabricated paper trail made
     discovery of his fraud difficult."); Jennings, 711 F.3d at 1145
25   ("Conduct need not involve highly complex schemes or exhibit
     exceptional brilliance to justify a sophisticated means enhancement.
26   Defendants' effort to conceal income by using a bank account with a
     deceptive name was sufficiently sophisticated to support application
27   of the sentencing enhancement."); United States v. Young, 537 F.
     App'x 777, 781 (9th Cir. 2013) (affirming sophisticated means
28   enhancement, noting "Here, the government offered considerable
     evidence that Young used multiple accounts and corporations as part
     of his fraudulent scheme.").

                                    10

1  that defendant submitted in the offense.  (PSR ¶¶ 20 n.1, 34.)  The

2  criminal complaint describes the fraudulent documents too.  (DE1 at

3  12-13, 15-16, 26.)  Making up the number of employees and payroll on

4  different loan applications and submitting multiple different types

5  of fabricated tax documents, for multiple different business

6  entities, to different banks, is sufficient to meet the Ninth

7  Circuit's threshold for the sophisticated means enhancement to apply.

8  Accord, e.g., Tanke, 743 F.3d at 1307-08 (finding that enhancement

9  applied because defendant "created at least six false invoices and

10  falsified carbon copies of checks in Azteca's check register on at

11  least 10 occasions to conceal the payments.").

12  **IV.  GOVERNMENT'S POSITION REGARDING SENTENCING**

13      **A.    Summary of the Government's Position**

14      Defendant exploited a government benefits program during the

15  international COVID pandemic crisis.  He committed the serious

16  federal crime of fraud involving COVID-related PPP benefits, where

17  defendant made false statements and submitted fabricated tax

18  documents to try to steal more than $2,000,000 in PPP funds that were

19  intended to assist employees who had been adversely affected by the

20  COVID pandemic.  While he did not succeed in tricking the banks to

21  give him all the funds for which he had applied, he did obtain more

22  than $360,000 through fraud.  Simply put, defendant stole taxpayer

23  guaranteed funds intended to help those who had been hurt by the

24  COVID pandemic.  And he did so more than once, with multiple

25  fraudulent loan applications.  And he used multiple fabricated

26  federal tax documents to effectuate his fraud.

27      In addition to the seriousness of the crime, defendant's

28  sentence must address general deterrence – to stop others from trying

11

the same thing.  Defendant also must be specifically deterred: not only have the lenient sentences he previously received failed to send him the message that he must stop committing crimes, but the seriousness of his crimes have increased to the instant fraud involving an intended loss in the millions.

The government does not object to the Guidelines calculations of the Probation Office.  As to the appropriate sentence, the government also agrees with Probation's recommended sentence and believes that a low-end Guidelines sentence – after applying a COVID-based two-level variance – is appropriate in this case.

As discussed below, the government respectfully recommends the same sentence recommended by Probation: 51 months' imprisonment, followed by 5 years of supervised release, and $360,415 in restitution payable to Bank of America.

**B.    Two level downward variance**

In the plea agreement, the government agreed that defendant was entitled to the so-called COVID variance, that is, a two-level downward variance as recognition of defendant's early acceptance of responsibility.  (DE38 ¶ 5f.)  Defendant entered a plea agreement shortly after his house was searched, accepted responsibility by interviewing with the government, and has otherwise demonstrated early acceptance of responsibility.  Thus, the government believes that this two-level downward variance is appropriate in this case.

**C.    The § 3553(a) Factors Otherwise Call for a Guidelines Sentence.**

Under 18 U.S.C. § 3553(a), the Court should impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing as set forth in § 3553(a)(2).  The Court is

to consider various factors in determining the particular sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [¶] (2) the need for the sentence imposed -- [¶] (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [¶] (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant; . . . [¶] (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines]; . . . [¶] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and [¶] (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Here, application of those factors supports the conclusion that the sentence recommended by Probation and the government, which is a below-Guidelines sentence, is a reasonable and appropriate sentence for defendant.

### 1. Nature, Circumstances, and Seriousness of the Offense

Defendant committed a very serious federal crime, involving an intended loss of more than $2,000,000 of taxpayer funds (and more than $360,000 of actual loss), which he perpetrated not only with false statements, but also with multiple fabricated tax documents. And as shown by the government's exhibit,[7] defendant not only did

---

[7] The government is filing the exhibit under seal, because it includes tax information.

defendant submit the fraudulent loan applications, but when the bank started asking questions about one of them, rather than withdraw his fraudulent request, he continued to try to pursue his scheme to steal the money, including by attempting to shift blame to his CPA for any discrepancies in the information he had submitted.  (Exhibit-1 at MAGANA_00002508).  Moreover, when defendant did succeed in tricking one bank to approve his fraudulent application and $940,416 was wired into one of his bank accounts, defendant refused to consent to return those fraudulently obtained funds when the bank asked him.

Defendant did not file just one loan application with one false statement; he filed multiple fraudulent loan applications.  He submitted those fraudulent applications to different banks.  Not only did defendant submit multiple loan applications with false statements, but he also submitted multiple fabricated tax documents to attempt to substantiate the false information on the fraudulent loan applications.

All of the above shows a level of criminal activity that should be punished.

### 2.   Defendant's History and Characteristics

Defendant's history and characteristics lack significant mitigation in this case.  Defendant has a sizable criminal history, which resulted in a Criminal History Category of III.  (PSR ¶¶ 47-51).  For example, in 2012, defendant was convicted of owning a chop shop.  (Id. ¶ 49.)  Two years later, defendant was convicted of vehicular manslaughter.  (Id. ¶ 50.)

Defendant's upbringing appears to have been stable, and he maintains close relationships with his parents and siblings.  (Id. ¶¶ 57-60.)

1    Moreover, defendant appears to have been able to make a

2    legitimate living, including during 2019, making a quite good living

3    of $13,000 monthly, and before that, earning $75,000 per year from

4    2002 to 2014, before he went to jail.  (Id. ¶¶ 78-80.)  Likewise,

5    defendant owns his four-bedroom, three-and-half-bathroom residence

6    and owned several other properties through his business, some of

7    which he has now sold since his arrest.  (Id. ¶¶ 66-68, 81, 86-88.)

8                  **3.    Adequate Deterrence to Defendant and the Public**

9        Based upon his criminal history and the facts of this case,

10   specific deterrence appears to apply in this case.  As defendant's

11   criminal history detailed in the PSR shows, defendant has committed

12   various criminal offenses but has usually escaped meaningful

13   punishment, by receiving probation or light sentences – with the

14   longest sentence of 365 days in jail.  Those short or probationary

15   sentences do not seem to have deterred defendant from committing

16   crimes.  To the contrary, it appears that defendant's criminal

17   conduct has escalated to the instant scheme - a serious federal crime

18   involving millions of dollars of fraud.[8]

19       Likewise, general deterrence is a very important consideration

20   in this case.  The need for public deterrence supports the

21   recommended sentence.  Given the prevalence of COVID-related fraud

22   against the government – billions of dollars in PPP-related fraud

23   during the past couple years, general deterrence would be served by a

24   sizable prison sentence in this case, so that people stop committing

25   these crimes.

26

27

28       [8] The PSR also reports that defendant's probation from his 2012
conviction was revoked in 2014, and he was sentenced to 180 days
jail.  (PSR ¶ 49.)

15

The COVID-19 pandemic is not over.  The PPP loan program has now been addressing an important next step — loan forgiveness.  For example, the SBA announced that as of September 21, 2021, it had recorded its one millionth PPP loan forgiveness application for borrowers seeking forgiveness for loans of $150,000 or less, totaling more than $17 billion of requested relief.[9]  In order for PPP loans to be forgiven, businesses will need to certify that they used the funds for their intended purpose —for payroll, rent, and utilities.  News of PPP loan fraud will likely reach others who applied for such relief or who were intended to do so, even though either the loan was fraudulently obtained, or loan forgiveness is not proper.  Accordingly, the sentence that the Court imposes in this case may serve as a warning to others to not commit a similar crime.

In short, people who commit COVID-related benefits fraud against the government need to know that they will be held accountable - and will be imprisoned for years in federal prison.

### 4.   Need to Protect the Public from Defendant

The government agrees with Probation that imposing years of supervised release is appropriate in this case.  Given defendant's criminal history and the instant criminal conduct, the government agrees and recommends five years of supervised release, so that the Probation Department and the Court can monitor defendant and prevent recidivism.

---

[9] "SBA Administrator Announces New Paycheck Protection Program (PPP) Milestone: In Less Than Two Months, One Million Borrowers Apply for Direct Forgiveness through Agency's PPP Portal," available at https://www.sba.gov/article/2021/sep/22/sba-administrator-announces-new-paycheck-protection-program-ppp-milestone-less-two-months-one (visited 01/05/2022).

## 5.  **Need to Avoid Unwarranted Sentence Disparities**

The recommended below-Guidelines sentence of 51 months of imprisonment does not appear to be disparate to a sentence for a fraud conviction involving a loss exceeding two million dollars, in particular, COVID-related fraud.  While each case must be judged on its specific facts and sentences nationwide for PPP loan fraud have run from months to multiple years in prison, some recent sentences for PPP fraud during the last couple months include 110 months' imprisonment for a $2.6 million intended loss/$1.6 million actual loss (November 2021),[10] 41 months' imprisonment in a case involving a $7.9 million loss (January 4, 2022),[11] and 17, six, and five-year sentences for a scheme involving more than $20 million loss (November 2021).[12]  The recommended sentence falls within those ranges.

On the other hand, the government believes that the sentence for defendant's co-schemer, Steven Goldstein, should be considered when fashioning defendant's sentence, to avoid potential disparity.[13] However, there are some differences between defendant and Goldstein, including criminal history and loss amount.[14]  Nonetheless, with

---

[10] United States v. Lee E. Price, III, 4:20-cr-00522-1 (N.D. Texas).

[11] United States v. Hunter VanPelt, 1:21-cr-00006-MHC (N.D. Ga.).

[12] United States v. Richard Ayvazyan, et al., 2:20-cr-00579-SVW (C.D. Cal.); see also "Seven Members of Los Angeles-Based Fraud Ring Sentenced for Multimillion-Dollar COVID-19 Relief Scheme/Leader Sentenced to 17 Years in Prison," available at https://www.justice.gov/opa/pr/seven-members-los-angeles-based-fraud-ring-sentenced-multimillion-dollar-covid-19-relief (last visited 01/04/2022).

[13] On September 14, 2021, the Court sentenced Goldstein to 12 months and one day of prison.  (DE 54, 55, United States v. Goldstein, 2:20-cr-00597-SB.)

[14] Putting aside the intended loss figure, Goldstein caused $655,000 of PPP loan funds to be issued, while defendant caused about
*(footnote cont'd on next page)*

respect to the loans at issue, the government does not believe
defendant is any more culpable nor occupied a higher and different
role than co-schemer Goldstein.

Nonetheless, because federal sentences must be individualized,
"sentencing disparity is only one factor a court considers in
crafting an individualized sentence under § 3553(a). A district court
need not, and, as a practical matter, cannot compare a proposed
sentence to the sentence of every criminal defendant who has ever
been sentenced before.  Too many factors dictate the exercise of
sound sentencing discretion in a particular case to make the inquiry
[defendant] urges helpful or even feasible." United States v.
Treadwell, 593 F.3d 990, 1012 (9th Cir. 2010).[15]

Based upon the above, the government believes that a two-level
below-Guidelines sentence of 51 months of imprisonment is reasonable
and will adequately address the applicable Section 3553(a) factors.

### D.    Restitution

In the plea agreement, defendant agreed to make restitution.
The PSR correctly calculated restitution as $360,415.[16]  Assuming
defendant pays all the restitution before sentencing, the government
believes he should be commended for doing so.

## V.    CONCLUSION

During the past couple years, tens of billions of dollars in PPP
loans are suspected to have involved fraud.  E.g., "15% of Paycheck

_____

double that, $1,300,831, of PPP loan funds to be issued.  Only
through the admirable acts of U.S. Bank, which froze the funds issued
by Customers Bank, was defendant's actual loss limited to $360,415.

[15] Overruled on other grounds by United States v. Miller, 953
F.3d 1095 (9th Cir. 2020)

[16] In preparation for sentencing, federal agents recently
confirmed with the victim that the outstanding loan amount remains
$360,415.

*Protection Program Loans Could be Fraudulent, Study Shows; Some $76 billion of the program's $800 billion in loans may have been taken improperly, a new paper concludes,*" <u>New York Times</u> (August 17, 2021).[17]  Similarly, during the COVID pandemic over the past two years, criminals have robbed the state of California of billions to fraudulently obtain COVID-related unemployment benefits from California EDD.  *E.g.*, "*California officials say unemployment fraud now totals more than $11 billion,*" <u>Los Angeles Times</u> (Jan. 25, 2021);[18] "*1.4 million unemployment fraud cases could take a month to fix, EDD says,*" <u>Orange County Register</u> (Jan. 12, 2021).[19]

Defendant was part of that COVID fraud scourge.  He exploited a federal program intended to help others who were adversely affected by the worldwide COVID pandemic, and he perpetrated his scheme by using false statements and fabricated tax documents.  Defendant filed several PPP loan applications that had false statements in his attempts to obtain more than two million dollars of taxpayer funds to which he was not entitled.  He went even further and submitted

---

[17] *Available at* https://www.nytimes.com/2021/08/17/business/ppp-fraud-covid.html (last visited 01/05/2022); <u>see also</u> "$84 Billion in PPP Loans Are Potentially Fraudulent, But Only 1% of Funds Have Been Seized," <u>Newsweek</u> (March 24, 2021), *available at* https://www.newsweek.com/84-billion-ppp-loans-are-potentially-fraudulent-only-1-funds-have-been-seized-1578708 (last visited 04/12/2021).

[18] *Available at* https://www.latimes.com/california/story/2021-01-25/california-unemployment-fraud-11-billion-investigations (last visited 03/29/2021.)

[19] *Available at* https://www.ocregister.com/2021/01/12/1-4-million-unemployment-fraud-one-month-fix-edd-jobs-layoff-economy/ (last visited 03/29/2021).  See also "*Inland Empire Woman Sentenced to Over 3 Years in Prison for Using Stolen Identities to Fraudulently Obtain Over $500,000 in COVID Relief,*" *available at* https://www.justice.gov/usao-cdca/pr/inland-empire-woman-sentenced-over-3-years-prison-using-stolen-identities-fraudulently (last visited 01/07/2022).

fabricated tax documents to support his false statements and fraudulent loan applications.  Defendant went even further by continuing to pursue his fraudulent applications with the banks when they initially identified discrepancies in his information, and in one instance, defendant appears to have blamed his CPA for that discrepancy.  When one bank identified his fraud after it had been tricked into wiring him $940,416, defendant refused to consent to return those funds.  By his fraud, defendant was ultimately able to steal more than a million dollars in PPP funds.

General and specific deterrence are important considerations here.  Defendant's prior lenient sentences have not deterred him from continuing to break the law.  Moreover, a sizable federal prison sentence in this case should send a strong message to others that such COVID relief fraud will be swiftly and appropriately punished and that those engaging in it can and will be held accountable.

On the other hand, defendant did quickly admit culpability and pleaded guilty immediately thereafter.  That, however, is largely addressed by the two-level downward variance and low end Guidelines sentence recommended by the government, which if granted, lowers his sentencing range by about a year, from 63-78 to 51-63 months.

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence:

1.    51 months of imprisonment;

2.    5 years of supervised release;

3.    $360,415 restitution;

4.    $75,000 fine; and

5.    $100 special assessment.