WILLIAM S. PITMAN (SBN 131253)
Law Offices of William S. Pitman
65 North Raymond Avenue, Suite 320
Pasadena, CA 91103
Tel: (213) 629-0272
Fax: (213) 629-0208
Email: william_pitman@sbcglobal.net

Attorney for Defendant
Raymond Magana

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> RAYMOND MAGANA, ) <br> ) <br> Defendant. ) <br> _____ ) | Case No. 2:21-cr-00007-SB <br><br> **DEFENDANT'S POSITION RE: SENTENCING FACTORS** <br><br> Date:  January 25, 2022 <br> Court: Hon. Stanley Blumenfeld, Jr. |

     Defendant RAYMOND MAGANA, through counsel, hereby and herewith submits his position, with exhibits, with respect to the sentencing factors in this case.

     Defendant reserves the opportunity to make additional comments through counsel at the time of the sentencing hearing.

Dated: January 10, 2022.

                                       Respectfully submitted,
                                       LAW OFFICES OF WILLIAM S. PITMAN

                         By      */s/ William S. Pitman*
                                 WILLIAM S. PITMAN
                                 Attorney for Defendant
                                 RAYMOND MAGANA

# I

# INTRODUCTION

On January 26, 2021, shortly after his first appearance, Raymond Magana accepted responsibility for and pled guilty to a one count Information alleging a violation of 18 U.S.C. §§ 1040(a)(2), 2(b) involving false statements on a PPP loan application. At the time of the offense, Mr. Magana was self-employed and working in the real estate business. Essentially, he would purchase distressed properties, renovate them and resell them at a profit.

The charges arose out of PPP loans and applications that the defendant applied for early in the Covid pandemic both individually and with Steven Goldstein. The defendant ultimately received $360,415.00 in PPP loans. The money was used to prevent the residential remodel properties from going into default, to pay workers and to keep the businesses afloat. This included making mortgage payments on the properties, paying laborers, contractors, paying for materials and maintaining permits and city fees. None of the funds were used to purchase personal luxury items. Almost all the money went into the businesses and to pay modest salaries.

Mr. Magana is extremely remorseful and regretful with regard to the conduct he engaged in. He self-surrendered, waived indictment, agreed to plead guilty almost immediately after his first appearance and has fully complied with Pretrial Services and all conditions of his pretrial release. He has also worked extremely hard this past year to support his children and himself and is on the cusp of making full restitution.

# II

# STATEMENT OF FACTS

Mr. Magana is currently 41 years-old. He has been self-employed purchasing, renovating and reselling residential properties since 2016. That year, a real estate agent introduced him to Steven Goldstein (who was separately charged in Case No.

2

20-cr-00597-SB) and the two formed Antelope Valley Residential Development, LLC. Mr. Magana also worked through two other LLCs: Forward Builders, LLC and The Building Circle, LLC. Mr. Goldstein maintained a separate LLC known as Beagle Real Estate Investments. Each of the businesses obtained financing from banks, hard money lenders, friends, relatives and other investors.

In March, 2020, the Covid-19 pandemic and associated lockdowns and shortages began. It was an unprecedented time and caused panic and fear throughout the world. In the United States, small business owners and self-employed individuals were hit extremely hard. Housing sales ceased for many months and work (for many) slowed to a standstill. Mr. Magana's business was significantly impacted by this. Apart from ongoing projects, loan payments, costs of materials and labor expenses, several properties fell out of escrow. Like so many others, Mr. Magana experienced financial panic and fear that his businesses would fall apart. He felt an obligation and responsibility to his investors, contractors, laborers and dependents to figure out a way to save the businesses.

It was in this setting that Mr. Magana and Mr. Goldstein became aware of PPP loans being offered to qualified businesses through the CARES Act to help offset the economic realities and loss resulting from the pandemic. Among other things, the CARES Act authorized loans to small businesses to continue to pay employees salaries, rents, interest on loans/mortgages and other related business expenses.

Mr. Magana and Mr. Goldstein believed that they did not qualify for the loans because they did not have payroll employees and would not otherwise be able to submit the required documentation. As a result, they made the obviously regrettable decision to provide false information in an attempt to obtain PPP loans. Because they did not have payroll records, Mr. Goldstein went to a close friend and neighbor and hired him to assist in preparing the necessary documentation–falsified payroll

records and tax documents.[1]

Mr. Magana, with Mr. Goldstein's substantial assistance, also applied for a loan with a company called Kabbage in the amount of $940,416.00 in the name of the Building Circle, LLC.[2] They used the template provided by the individual who prepared the earlier documentation with modifications. The loan ultimately funded but was not paid out.[3]

Mr. Magana actually received $360,415.00 in PPP funds which is reflected in his plea agreement and the PSR. The funds were used to pay mortgages and keep projects moving by buying materials and paying contractors and workers. None of

---

[1] In his both his initial statements to agents and his later proffer to the government, Mr. Goldstein failed to disclose this information. The information was brought to the attention of agents by counsel for Mr. Magana and documented through text messages Mr. Goldstein had sent to Mr. Magana reminding him that [Fred] would be owed $1,000.00 from each loan once they were funded. (Copies of two text messages from Mr. Goldstein to Mr. Magana confirming this agreement are attached as Exhibit A). The text messages and emails that Mr. Magana provided to the government in March of 2021 have been previously submitted to the USPO by the government. This information is not meant to minimize Mr. Magana's conduct in any way, but is important to provide the actual circumstances regarding the offense conduct and to provide context regarding relative culpability as explained in more detail below.

[2] Two other individuals George xxxx and Jennifer xxxx each had a 25% interest in the LLC which had been set up to purchase and renovate rental properties in the Bakersfield area. Neither is alleged to be involved in the fraudulent loan application.

[3] Again, in his initial statements to the agents and his later proffer, Mr. Goldstein denied any involvement in or knowledge of the Building Circle loan application. These denials were contradicted by numerous text messages from Mr. Goldstein that were provided to the case agents by Mr. Magana's counsel. It is undisputable that Mr. Goldstein knew about the loan and expected to receive funds from it as well. A small sample of the text messages are attached as Exhibit B. This information is not meant to minimize Mr. Magana's conduct in any way, but it is important to provide the actual circumstances regarding the offense conduct and to provide context regarding relative culpability. It is also important to note that Mr. Goldstein was not held accountable (for purposes of the sentencing guidelines or otherwise) for his participation in this loan application or for his lies and deception during his debriefings.

4

the money received was not used to pay for luxury type items or spent in any type of frivolous manner. While a small percentage of the funds were used to pay necessary living expenses for Mr. Magana and his two children, the bulk was used to keep the businesses afloat and continue to pay vendors, contractors and workers.

As a single parent of his ten year-old son and co-parent of an almost two year-old daughter, Mr. Magana is finally close to being able to pay full restitution. Since the time of his change of plea and an improved real estate market, Mr. Magana has been continuing to keep his businesses operational. He has been working on two major projects for almost a year and they are near completion. One was placed on the market this month and the other property will be listed in approximately two weeks. The realistic expected profits based on comparable sales will be sufficient to pay full restitution in the amount of $360,415.00.

### III
### MR. MAGANA'S BACKGROUND

Mr. Magana grew up in a working class neighborhood in East Los Angeles and is the oldest of five siblings. Although there were many active gangs in the area in the 1980s and 1990s, Mr. Magana was able to avoid becoming involved in gang activity and graduated from Garfield High School in 1999. In 2005 he earned an associate degree in liberal arts from East Los Angeles College.

At the age of 22, Mr. Magana began working for Bank of America as a call center customer service representative. He worked there for twelve years until 2014 and was promoted to a managerial position. He met Mariama Barrett in 2005 and they married in 2009. In 2011, Mariama gave birth to their son, Raymond Elijah Magana (Elijah) who is now 10 years-old.

In 2014, Mr. Magana, while still employed by Bank of America, was attending a several month training program in Baltimore, Maryland. Mr. Magana would often fly home on the weekends to spend time with Mariama and Elijah and help out at home. He would typically arrive in Los Angeles late on Friday night and fly back to

Maryland on a Sunday night redeye.

On March 28, 2014, Mr. Magana took a late flight to Los Angeles and arrived home after midnight. The next morning he was up at the crack of dawn. He went to Home Depot, did some construction work at their house, and took Elijah to play Tee Ball. Later that evening, Mr. Magana and Mariama dropped Elijah at his grandmother's house and went to a small social gathering nearby. After the gathering ended, Mr. Magana and Mariama picked up Elijah and began driving home. Mariama, who had several drinks at the gathering, was in the front passenger seat. Elijah was in the back seat in a child's car seat. Mr. Magana who had at most three drinks during the entire event was driving.[4]

While driving on Colima Road on a curvy downward slope, Mr. Magana, who was exhausted, drifted slowly across the center of the roadway and hit an oncoming car. His car veered out of control and then came to a stop. The driver of the second vehicle suffered abrasions and a fractured rib.

The airbags on Mr. Magana's vehicle all deployed except for the right front passenger airbag where Mariama was seated. Mariama, who was asleep with the seat reclined, died immediately. Elijah's injuries consisted of abrasions and cuts. Contrary to the PSR and USPO Recommendation Letter, only Mariama died as a result of the accident. (*See* PSR ¶ 61; USPO Recommendation Letter p. 6, 7.) There were no other fatalities associated with the accident.

Pursuant to a plea agreement, Mr. Magana pled No Contest to one count of Vehicular Manslaughter While Intoxicated Without Gross Negligence (California Vehicle Code § 191.5(b)) as a felony and one count of Child Endangerment (California Penal Code § 273a(a)). He was placed on three years formal probation with a condition that he serve 365 days in the County Jail. The Court also imposed,

---

[4] A blood analysis performed by the Los Angeles County Sheriff's Department determined that Mr. Magana's Blood Alcohol Content was 0.08% at the time of the accident. A second test performed by Forensic Toxicology Associates determined the Blood Alcohol Content to be 0.06%.

but stayed, a two year prison sentence.[5]

After the accident and death of Mariama, Mr. Magana was totally devastated and became extremely depressed. He blames himself and has replayed the incident over and over in his mind. He did not work for almost two years and devoted his time to his family and raising Elijah. He also met with a therapist during this time to cope with the devastating loss of Mariama. These were extraordinarily difficult times for Mr. Magana and he began self medicating with marijuana to help him sleep and deal with his depression.

In 2016, Mr. Magana started working in the real estate business. He attended classes and worked extremely hard to develop contacts and learn the business. By 2017 he was making a profit and expanding his business. He met Mr. Goldstein around this time and they began working together shortly thereafter.

In 2017, Mr. Magana started a relationship with Porsha Daniels. Mr. Magana was a single parent to Elijah at the time and in 2020 Porsha gave birth to a daughter named Karis who is now two-years old.

Mr. Magana has been on bond under the supervision of Pretrial Services. He has maintained compliance with the terms of his bond.

///
///
///
///
///

---

[5] The PSR determined that this offense warranted two criminal history points under the USSG. Also, in February of 2014, Mr. Magana was convicted of two misdemeanors related to his possession of a stolen motorcycle and stolen motorcycle parts (which were purchased on the internet) in 2012. He was sentenced to one year of summary probation. After his plea and sentence on the vehicular manslaughter case, his probation was violated and he was sentenced to serve 180 days in the County Jail to run concurrent with his previously imposed sentence. The PSR determined that this offense also warranted two criminal history points.

7

# IV

# OBJECTIONS TO THE PRESENTENCE REPORT

PSR ¶¶ 22, 30-32

The PSR calculates a loss (or intended loss) amount of $1,555,248.00. Mr. Magana disagrees with this calculation. The defendant submitted an application for and received $360,415.00. He also submitted an application with Goldstein's involvement for a loan in the amount of $940,916.00. Although the funds were not received, the amount is calculated as an intended loss. Accordingly, the total amount of loss plus intended loss is $1,301,331.00.

The PSR calculates another loan application from Antelope Valley Residential Development (Antelope Valley) for $252,917.00. Although Mr. Magana was a 50% partner with Steven Goldstein in this company the loan application listed Goldstein as the principal and Mr. Magana was not involved in applying for the loan. Accordingly, the 16 point adjustment pursuant to USSG § 2B1.1(b)(1)(I) is incorrect. The appropriate increase should be 14 points because the amount of the loss or intended loss was between $550,001.00 and $1,500,000. (*See* USSG § 2B1.1(b)(1)(H).) The two point decrease would reduce the defendant's offense level from 24 to 22 with a corresponding range of 51 to 63 months.

PSR ¶ 61; USPO Recommendation Letter p. 6, 7

As noted above, there were no other fatalities associated with the automobile accident resulting in Mariama's death.

///
///
///
///
///
///

8

# V
# THE 18 U.S.C. §3553(a) FACTORS SUPPORT A SENTENCE OF NO MORE THAN 24 MONTHS IN CUSTODY AND THREE YEARS SUPERVISED RELEASE

Under <u>United States v. Booker</u>, 543 U.S. 220 (2005), the courts must take the Guidelines into account under 18 U.S.C. § 3553(a)(4) as one factor to be considered in imposing a sentence, but are not required to sentence within the guideline range.

18 U.S.C. §3553(a) states that in considering the sentencing factors set out in the statute, the Court shall impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

Paragraph 2 of Title 18 U.S.C. §3553(a) states that the factors to be considered in imposing such a sentence are the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed-

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    ( C ) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established...by the Sentencing Commission...[and]

(6) the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct."

In this case, a consideration of all of the factors set forth in 18 U.S.C. §3553(a) suggests that a non-guideline sentence of no more than 24 months imprisonment is warranted.

At the time of sentencing, district courts must treat the sentencing guidelines as an initial benchmark and then apply appropriate departures and variances. *Gall v. United States,* 552 U.S. 38 (2007). Moreover, while "departures" relate to the Guidelines, a "variance" refers to a non-guideline sentence outside the Guidelines framework. *Irizarry v. United States,* 553 U.S. 708, 714 (2008).

This is a case where a variance or non-Guideline sentence is appropriate. While Mr. Magana undoubtedly engaged in fraudulent conduct, his underlying motive for doing so was to prevent his business from crashing in the early days of the Covid pandemic and the concomitant panic, fear and desperation it brought with it. The funds obtained were used to prevent the properties from going into default, to pay workers and to keep the businesses afloat and protect investors. This included making mortgage payments on the properties, paying laborers and other contractors, paying for materials and maintaining permits and city fees. None of the funds were used for vacations, luxury items, vehicles, etc.

Additionally, and as noted above, Mr. Magana will be able to make full restitution by late March or early April of this year. He has spent the past year getting two properties ready to list for sale. The properties were essentially teardowns that had to be rebuilt from scratch. (*See* Defendant's Motion for Reconsideration, Docket No. 52.)

A sentence of no more than 24 months for Mr. Magana would also be appropriate in light of Mr. Goldstein's sentence of one year and one day. Without minimizing Mr. Magana's conduct in anyway, there is little question that Goldstein was more sophisticated than Mr. Magana and was involved in a

significantly higher actual loss amount than Mr. Magana. Additionally and initially, Mr. Goldstein hired a friend of his to prepare the false data in support of the loans and to prepare spread sheets. He would then provide the information to Magana whose role was to upload the information onto the PDF applications and submit them. Goldstein was also involved in the planning of the Building Circle loan ($940,916.00) and expected to profit from the proceeds if and when the loan was approved.

What is even more troubling is that after being shown unequivocal proof in March and April of 2021 that Mr. Goldstein lied to the agents and concealed crucial information both during his initial debriefing after his arrest and a later proffer session, the government recommended that he receive 21 months imprisonment. Although Mr. Magana has a criminal history, he never sought to mislead the government or agents in this case and he provided truthful and complete information to explain and clarify the false and misleading narrative concocted by Mr. Goldstein.

While sentencing is of course an individualized process, a sentence of no more than 24 months for Mr. Magana would be "sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. 3553(a)]" and would avoid an extreme sentencing disparity.

Mr. Magana is a single parent of his 10 year-old son and a co-parent of his 2 year-old daughter. While he has made some bad choices in the past, he has also demonstrated a significant work ethic and drive to succeed. He was employed for 12 years by Bank of America and has worked extremely hard to create a successful real estate business. During the period he has been under the supervision of Pretrial Services he has not used any marijuana and has continued working to put himself in a position to make full restitution and to support his family.

Mr. Magana understands that he made a terrible choice to engage in the fraudulent conduct in this case and he has accepted full responsibility for his

actions. He is deeply ashamed of himself and extremely remorseful on many levels. He knows that his conduct has caused and will continue to cause pain, sacrifice and heartache for his family and he has continually beaten himself up for his significant lapse in judgment.

When considering the circumstances of the offense, as well as the mitigating factors set forth in this memorandum, a sentence of no more than 24 months imprisonment, three years of supervised release and a condition that he participate in the Bureau of Prisons RDAP program and remain drug free while on supervised release would be "sufficient, but not greater than necessary" to comply with the sentencing factors set forth at 18 U.S.C. §3553(a)(2) and appropriate in this case. Mr. Magana is a salvageable human being with numerous redeeming qualities and a strong will to learn from his mistakes and rehabilitate and better himself.

## VI
## CONCLUSION

For all the foregoing reasons, it is respectfully requested that the relief sought be granted.

Dated: January 10, 2022.

Respectfully submitted,
LAW OFFICES OF WILLIAM S. PITMAN

By    /s/ *William S. Pitman*
WILLIAM S. PITMAN
Attorney for Defendant
RAYMOND MAGANA